2022 IL App (4th) 220181-U

NOS. 4-22-0181, 4-22-0182, 4-22-0183, 4-22-0184, 4-22-0185 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 21, 2022
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Abr. B.-F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|       Petitioner-Appellee, | ) | Nos.   19JA135 |
|         v.    (No. 4-22-0181) | ) |         19JA136 |
| Brian F., | ) |         19JA137 |
|       Respondent-Appellant). | ) |         19JA138 |
| | ) |         20JA138 |
| _____ | ) | |
| | ) | |
| *In re* Abl. B.-F., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|         v.    (No. 4-22-0182) | ) | |
| Brian F., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| *In re* At. B.-F., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|         v.    (No. 4-22-0183) | ) | |
| Brian F., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| *In re* Ar. B.-F., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|         v.    (No. 4-22-0184) | ) | |
| Brian F., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |

| | )
|---|---|
| *In re* Ak. B.-F., a Minor | ) |
| | ) |
| (The People of the State of Illinois, | ) |
| Petitioner-Appellee, | ) Honorable |
| v. (No. 4-22-0185) | ) Derek G. Asbury, |
| Brian F., | ) Judge Presiding. |
| Respondent-Appellant). | ) |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the judgments of the trial court terminating respondent's parental rights because the trial court's findings were not against the manifest weight of the evidence.

¶ 2 Respondent, Brian F., is the father of Abr. B.-F. (born April 2016), Abl. B.-F. (born April 2017), At. B.-F. (born March 2019), Ar. B.-F. (born March 2019), and Ak. B.-F. (born March 2020). (We note that At. B.-F. and Ar. B.-F. are twins.) In February 2022, the trial court found respondent was an unfit parent and termination of respondent's parental rights would be in the minor children's best interest. Respondent appeals, arguing that the trial court's fitness and best-interest determinations as to each child were against the manifest weight of the evidence. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4        A. The Proceedings Relating to Abr. B.-F., Abl. B.-F., At. B.-F., and Ar. B.-F.

¶ 5 In May 2019, the State filed petitions for adjudication of wardship for Abr. B.-F., Abl. B.-F., At. B.-F., and Ar. B.-F., alleging the children were neglected in that the children lived in an environment injurious to their welfare when living with respondent and their mother because they engaged in acts of domestic violence in front of the minor children. See 705 ILCS 405/2-3(1)(b) (West 2018). On the same day the petitions were filed, the trial court conducted a

shelter care hearing and placed temporary custody and guardianship of all four children with the guardianship administrator of the Department of Children and Family Services (DCFS). In August 2019, the trial court adjudicated the children neglected minors.

¶ 6        In October 2019, the trial court conducted a dispositional hearing at which it entered a written order making Abr. B.-F., Abl. B.-F., At. B.-F., and Ar. B.-F. wards of the court and finding respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors, and it was in the best interest of the minors to be made wards of the court. The court placed guardianship and custody of the minors with the guardianship administrator of DCFS. The written order also stated, "The parents are admonished that they must cooperate with the Department of Children and Family Services, comply with the terms of the service plans, and correct the conditions which require the child[ren] to be in care, or risk termination of parental rights."

¶ 7                    B. The Proceedings Regarding Ak. B.-F.

¶ 8        In March 2020, when Ak. B.-F. was born, the State filed a petition for adjudication of wardship, alleging that Ak. B.-F. was a neglected minor in that he lived in an environment injurious to his welfare in that respondent had been found unfit in Abr. B.-F., Abl. B.-F., At. B.-F., and Ar. B.-F.'s cases, among others, and "there has been no subsequent finding of fitness." The petition further alleged respondent had not completed services that would result in a finding of fitness or a return home of Ak. B.-F.'s siblings. At the shelter care hearing conducted the same day the petition was filed, the trial court placed temporary custody and guardianship of Ak. B.-F. with the guardianship administrator of DCFS.

¶ 9        In August 2020, the trial court adjudicated Ak. B.-F. a neglected minor. Immediately after the adjudicatory hearing, the court conducted a dispositional hearing at which

it (1) adjudicated Ak. B.-F. a ward of the court, (2) found respondent unfit for reasons other than financial circumstances alone to care for Ak. B.-F., and (3) placed guardianship of Ak. B.-F. with the guardianship administrator of DCFS.

¶ 10                                    C. The Termination Hearings

¶ 11            In July 2021, the State filed petitions to terminate respondent's parental rights as to each of the minor children. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) because he failed to make reasonable progress toward the children's return to him during the nine-month period of October 2020 to July 2021. *Id.* § 1(D)(m)(ii).

¶ 12            In February 2022, the trial court conducted a bifurcated termination hearing on the State's petitions.

¶ 13            1. *The Proceedings Addressing Respondent's Parental Fitness*

¶ 14            The guardian *ad litem* (GAL) asked the trial court to take judicial notice of its prior orders and the permanency hearing reports filed with the court. The court responded, "[A]s it relates to judicial notice given that the burden of proof is different, it's what's considered preponderance versus clear and convincing. It's for benchmark purposes as to what ongoing services were."

¶ 15            The permanency reports showed that respondent was required to engage in the following services: (1) individual counseling, (2) domestic violence counseling, (3) parenting classes, and (4) psychological evaluations.

¶ 16                                    a. Justin Sangalli

¶ 17            Justin Sangalli testified that he worked for "FamilyCore" and was the caseworker for all of the children from October 2020 through July 2021.

- 4 -

¶ 18    Sangalli testified that in the spring of 2021, the domestic violence service provider informed him that "both parents possessed the capabilities, possessed the tools, had reached their limit of service time, basically, of information that could be provided them. But they showed a lack of ability to apply those services when needed." Sangalli explained that respondent and the children's mother had "domestic violence incidents that took place in their home" which caused them to be unsuccessfully discharged from domestic violence services. Sangalli further explained that he could not get respondent services through another provider "based upon a previous issue of [respondent's]. So, there w[ere] just no other options for referrals to get him into domestic violence."

¶ 19    Regarding individual counseling, Sangalli testified that respondent initially attended marital counseling with the mother. However, the provider recommended switching to individual counseling after just a few sessions. Respondent attended individual counseling but was unsuccessfully discharged in March or April 2021 for lack of attendance.

¶ 20    Regarding visitation, Sangalli testified that both parents participated in visitation consistently until May 2021. Up until the end of May 2021, the parents had visits with the kids for "four hours in the[ir] home weekly, supervised by the agency." In May 2021, Sangalli received a call from a case aide reporting that the parents would not let the aide into the home for the scheduled visit. Sangalli went to the parents' home to see what was going on. When he arrived, the parents explained to Sangalli that "they did not know that case aide, did not trust that case aide and w[ere] not going to allow them to enter their home." Sangalli testified that the conversation "escalated" and he perceived "a little more aggression from both parents towards [him]." Sangalli left, called his supervisor, and informed the supervisor of the situation. Sangalli said they made the decision to shorten visits to two hours per week and to conduct them at the

agency.

¶ 21         In the months that followed, the parents began to miss visits with the children and were less cooperative. Because of marital problems between respondent and the mother, the agency separated them for visits, meaning each parent saw the children for one hour. Sangalli testified that respondent missed one visit because he was in jail. Sangalli testified he never felt it was safe to return the children home at any point to either parent.

¶ 22         On cross-examination, Sangalli testified that when he went to the parents' home in May 2021, respondent was speaking calmly and not yelling when Sangalli first arrived. Sangalli further stated that the case aide was not present when he arrived and he did not observe respondent refuse to let the case aide in the home.

¶ 23                         b. Respondent's Testimony

¶ 24         Respondent testified that he attended counseling and domestic violence services beginning in October 2020. He explained that he and his wife initially received marital and domestic violence counseling together but that ended when their service provider completed his internship. Thereafter, respondent attended individual counseling and obtained domestic violence services from a different service provider. Regarding counseling, respondent stated that he attended one session of marital counseling with the children's mother but the provider recommended individual counseling and discharged the parents from couples' counseling. Respondent said he was told the discharge would be considered "neutral" not unsuccessful.

¶ 25         Respondent acknowledged that he was discharged from individual counseling because he missed too many sessions in the spring of 2021. He explained that he missed the sessions because of work, his financial situation, and the other services he was required to attend. Respondent stated he had a very busy schedule with multiple services and struggled to maintain

enough hours at his job to afford his home.

¶ 26    Regarding domestic violence, respondent testified that he learned many skills from the domestic violence services he received and he used them. On cross-examination, respondent described one incident during the winter of 2020 and 2021 during which he got into a verbal argument with his spouse and applied the techniques he had learned. He testified that the techniques did not work with her. Respondent explained that he tried to communicate calmly and when that did not work, he "stepped back for a little bit, gave [her] a breather." When he attempted to reinitiate communication, she "flared up further."

¶ 27    Respondent testified he then decided to go outside and smoke a cigarette to "calm down and just let it go and breathe easy." Respondent said when he went back inside, his spouse was still very upset and was escalating things. Respondent began to pack his things and told her he was going to take a "time-out away from this." She escalated the conflict by "pushing things or storm[ing] into the room." Respondent said he made a mistake by following his spouse to continue a heated conversation even though he was trying to calm her down. Respondent also acknowledged he blocked a doorway. His spouse called the police after respondent began to follow her.

¶ 28    The State then asked respondent, "What about the allegations about punching her back window of the van and slashing her tires?" Respondent stated the tires were never slashed and explained the broken window as follows. Respondent got in the car and his spouse came to get him out. Respondent stepped out of the vehicle and walked around to the back of the vehicle. As he did so, she began to back up into him. Respondent did not know if she was aware he was there, so he tapped on the back window and began to back away. When the van kept coming towards him, he hit the window to stop her from running him over.

¶ 29                              c. The Trial Court's Parental Fitness Findings

¶ 30        Before issuing its ruling, the trial court reiterated that it was only considering the court orders and reports that it earlier took judicial notice of for "benchmark purposes and identifying services from which progress would be measured."

¶ 31        The trial court determined that the State had proved the allegations regarding lack of reasonable progress. The court explained that it found Sangalli's testimony credible and respondent's testimony questionable. The court stated it believed respondent was downplaying his involvement in the two domestic violence incidents about which he testified, particularly when respondent discussed breaking the car window. However, even assuming respondent was telling the truth, the court noted that during the nine-month period alleged in the petitions, respondent (1) chose to continue living with a partner who was provoking or instigating domestic violence incidents and (2) was not able to successfully implement what he learned in domestic violence classes to create a safe environment so the children could be returned home.

¶ 32        The trial court further noted that visits did not progress to unsupervised at any point and Sangalli never believed it was safe to return the children. The court also observed that respondent did not complete any of his services and was unsuccessfully discharged, regardless of the reasons therefor. Accordingly, the court found the State proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the children during the relevant nine-month period.

¶ 33        2. *The Proceedings Addressing the Children's Best Interest*

¶ 34        Immediately after the fitness proceedings concluded, the trial court conducted a hearing on the issue of whether terminating respondent's parental rights was in the children's best interests.

¶ 35    Sangalli testified that Abr. B.-F. and Abl. B.-F. were placed together in a fictive kin placement. At. B.-F. and Ar. B.-F., the twins, were placed together in a traditional foster home, and Ak. B.-F. was in a separate traditional foster placement. Sangalli testified that the placements were currently providing each of the children with all of their material, educational, and emotional needs. The children had established strong bonds with their foster parents, and the younger three children had spent more time living at their current placements than with respondent. Sangalli opined that the two older children, Abr. B.-F. and Abl. B.-F., had a stronger bond with their foster parents than with the biological parents based on where those children went to seek emotional support and stability. Sangalli further testified that the foster parents provided safe, loving, stable homes for the children and all wished to provide permanency through adoption.

¶ 36    Respondent testified that he was living by himself in a house that was large enough to accommodate all of the children. Respondent stated he was willing and able to provide food, shelter, and clothing for the children and was fully capable of caring for the children. Respondent said he was bonded to all of his children but particularly to Abr. B.-F. because he was older. Respondent said that words could not describe the bond he had with Abr. B.-F. but characterized it as "unbreakable." Respondent stated that when he had in-home visits with the children, he played with them, fed them, and did many different activities with them. Respondent testified, "I got kind of comfortable with feeling like for those few hours my family was intact. *** [I]t's what I could picture everyday life being. It's happy." Respondent also emphasized that the children had a close relationship with his family and friends, including his two older children.

¶ 37    The trial court found termination of respondent's parental rights to be in the children's best interests. The court noted that even though respondent had a bond with his

children, the children had a stronger bond with their foster parents. The court noted that the children had spent the majority of their lives in their current placements where their needs were being met on a daily basis. The court concluded that the children were "very well-bonded" with the foster parents, who were doing the "heavy lifting" of day-to-day care. Accordingly, the court terminated respondent's parental rights as to all five children.

¶ 38        This appeal followed.

¶ 39                              II. ANALYSIS

¶ 40        Respondent appeals, arguing that the trial court's fitness and best-interest determinations as to each child were against the manifest weight of the evidence. We disagree and affirm.

¶ 41                    A. The Fitness Determinations

¶ 42                        1. *The Applicable Law*

¶ 43        The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2020). Reasonable progress is an objective review of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta.T.*, 2021 IL App (4th) 200658, ¶ 51, 187 N.E.3d 763. Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Id.*

¶ 44        A determination of parental unfitness involves factual findings and credibility

determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 45                                    2. *This Case*

¶ 46        Here, Sangalli testified that respondent was engaged in individual counseling and domestic violence counseling but was unsuccessfully discharged from both because respondent (1) missed sessions and (2) failed to implement what was being taught. Regarding domestic violence, Sangalli stated the service provider believed it could not teach respondent anything further. Sangalli also mentioned that respondent had instances of domestic violence during the nine-month period in which respondent was supposed to be making measurable progress toward the safe return home of his children. Sangalli testified that after the incident during which respondent and the mother would not let a case aide into the home for supervised visits, Sangalli and his supervisor made the decision to decrease visiting time to two hours, supervised at the agency. Sangalli further testified that respondent and the mother could no longer attend visits together due to their relationship issues.

¶ 47        Respondent, in large part, testified similarly to Sangalli. Respondent provided justifications for why he was unsuccessfully discharged that could have minimized his fault. However, the trial court found his credibility questionable, and even after taking respondent at his word, the court believed the two instances of domestic violence about which respondent testified demonstrated that the home environment was still unsafe for the children. The court noted that (1) Sangalli never believed it was safe to return the children home, (2) respondent

chose to continue living with the mother during the nine-month period, and (3) visits never progressed to unsupervised. Accordingly, we conclude that the trial court's findings that respondent was unfit for failing to make reasonable progress were well supported by the record.

¶ 48                            B. The Best-Interest Determinations

¶ 49                        1. *The Applicable Law and Standard of Review*

¶ 50        At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953; see also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 51        A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision

regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 52                                    2. *This Case*

¶ 53            At the best interest hearing, the State essentially used the statutory "best interest factors" (705 ILCS 405/1-3(4.05) (West 2020)) as a guide for its direct examination, asking Sangalli if the foster parents were providing each factor for the children. And, as to each factor, Sangalli invariably answered in the affirmative. As the trial court noted, the children had spent the majority of their lives in their current placements and were well-bonded with the foster parents who were providing day-to-day care and meeting the children's needs. In particular, the children looked to their foster parents for emotional support and stability. As Sangalli explained, the children knew the foster parents "[are] there for them regardless." The children were attached to their current placements and foster parents, all of whom wished to provide permanency through adoption. We conclude the trial court's findings that termination was in the children's best interests were not against the manifest weight of the evidence.

¶ 54                                  III. CONCLUSION

¶ 55            For the reasons stated, we affirm the trial court's judgments.

¶ 56            Affirmed.