2024 IL App (1st) 231947
Opinion filed: May 16, 2024

FOURTH DIVISION

No. 1-23-1947

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* JAZ. R., JAT. R., and B.P., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellees, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 18 JA 1099 |
| Petitioner-Appellee, | ) | 18 JA 1100 |
| | ) | 18 JA 1101 |
| v. | ) | |
| | ) | |
| Jasmine M., | ) | Honorable |
| | ) | Kimberly D. Lewis, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hoffman and Martin concurred in the judgment and opinion.

**OPINION**

¶ 1     Jasmine M. (the mother) appeals the orders of the circuit court that found her unfit to parent her daughters Jaz. R., born August 2, 2011, and Jat. R., born November 24, 2009, and son B.P., born August 23, 2013 (together, children) and terminating her parental rights. The death of the mother's younger son A.R., born on January 31, 2017, gave rise to these proceedings. We affirm.

¶ 2     The fathers are not parties to this appeal. We will restrict our recitation of the factual background to the mother.

¶ 3    On November 16, 2018, the State filed petitions for adjudication of wardship, alleging that the children were neglected and abused based on an environment injurious to their welfare and creating a substantial risk of physical injury under sections 2-3(1)(b) and 2-3(2)(ii) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018)). In support, the State alleged that the mother had one prior indicated report for inadequate supervision and:

"On November 2, 2018 [A.R.] was found unresponsive in the family's home that had no heat. [A.R.] was transported to the hospital and pronounced dead upon arrival. Mother states she is primary caregiver for [A.R.]. Per the medical examiner, [A.R.'s] cause of death was multiple injuries due to child abuse and the manner was homicide. [A.R.] had acute and chronic rib fractures. "

¶ 4    The State attached an affidavit of Halema Townsend, an investigator for the Department of Children and Family Services (DCFS) that supported these factual allegations and added that there were "multiple unexplained injuries" to A.R., including the rib fractures and "increased liver enzymes indicative to blunt force trauma to the abdomen."

¶ 5    The circuit court on that day granted the State's motions for temporary custody of the children and appointed the Cook County Public Guardian as their guardian *ad litem* (GAL). On the motion of the GAL, the court entered an order directing that the mother's visitations with the children be supervised, noting that the family is in need of services and there was an ongoing police investigation as to A.R.'s death.

¶ 6    On September 16, 2019, the court entered a permanency order finding that DCFS had made reasonable efforts in providing services and set the matter for an adjudication hearing on November 19, 2019.

¶ 7      In separate orders on that date, the court granted the State's motion to amend the petitions. The State amended each of the petitions to add allegations as to the injurious environment claims that there was "a history of domestic violence between the mother and paramour." Additionally, the State added an allegation to the petition of Jaz. R. as to the injurious environment claim that she " was observed to have marks upon her body." The petition of Jat. R. was amended to add a claim of physical abuse under section 2-3(2)(i) of the Juvenile Court Act (*id*. § 2-3(2)(i)) with allegations that she was "observed with burns, loop marks and patterned scars" that medical professionals believed were consistent with physical abuse. The petition for B.P. was amended to add a claim for physical abuse with allegations that he "was observed with multiple scars upon his body" that medical personnel believed were "suspicious for child abuse."

¶ 8      Prior to the adjudication hearing on November 19, 2019, the court entered orders allowing the State to further amend all three petitions as to the children to reflect allegations of neglect for a lack of care under section 2-3(1)(a) of the Juvenile Court Act (*id*. § 2-3(1)(a)) because the children's teeth were decayed. The State also added allegations of excessive corporal punishment as to the injurious environment claims and withdrew the claims of physical abuse without prejudice.

¶ 9      The evidence at the adjudication hearing included the parties' stipulation of facts. According to the stipulation, the mother was custodial and the fathers were noncustodial at all times relevant to the petitions. The mother has one other child who is not in her care. In 2013, there was a prior indicated case against the mother for inadequate supervision.

¶ 10      The petitions involving the children originated with a hotline call on November 2, 2018, when the mother found A.R. unresponsive. At that time, A.R. was in the care of the mother and

her boyfriend, T.P., who was living with the mother. The medical examiner found that A.R. had both new and healing rib fractures, his death was caused by multiple injuries due to child abuse, and the manner of his death was homicide. Both the mother and T.P. were indicated for A.R.'s death; the mother was indicated for risk of injury and an injurious environment as to the children. T.P. died of a self-inflicted gun-shot wound on November 5.

¶ 11    The mother told Townsend that on November 2, A.R. and B.P. were sleeping in the middle of the bed and she and T.P. were on either side. Jaz. R. and Jat. R. were with their maternal grandmother. At 4 a.m., the mother woke and found A.R. nonresponsive.

¶ 12    On November 14, medical personnel at HealthWorks examined the children and found scars and marks on all of them. The mother told Townsend that she did not know how the children received those injuries.

¶ 13    Detective Neals, who was assigned to investigate the death of A.R., visited the mother's apartment on November 2. The apartment was being heated only by a stove. At the hospital, he observed that A.R. had bruises on his chest and back and a scratch on his face; there was dried vomit in his jacket hood.

¶ 14    Detective Redd interviewed the mother as part of his investigation into the death of T.P. The mother explained that she had been dating T.P. for seven months and he had lived with her for three months. On two to three occasions, when the children were not present, T.P. had hit her with his fists and left bruises.

¶ 15    The mother also spoke to Redd about the circumstances surrounding A.R.'s death. On November 1, she and T.P. cooked dinner; A.R. threw most of the food on the floor. The mother gave A.R. a bottle and put him down on a pallet on the living room floor because she knew that

T.P. would be smoking marijuana in the only bedroom. About 7:45 p.m., the mother left the apartment with a friend "to go steal items from a mall in Indiana." T.P. volunteered to watch A.R. and B.P. The mother returned to the apartment about 12:30 a.m. A.R. and B.P. slept on the floor in the living room and not in the bed as she first reported.

¶ 16    On November 5, T.P. overheard a phone conversation between the mother and her aunt who told the mother that police were looking for T.P. as to the murder of A.R. The mother then heard T.P. say "I am sorry" followed by the sound of a gun being fired. The mother found T.P. on the floor with a gunshot wound to his head.

¶ 17    Detective Gilleran spoke to the mother on April 3, 2019. The mother informed the detective that T.P. had hit her five times between August and September 2018 because he believed she was cheating on him and once threatened to kill her with a gun. T.P. took pills that caused him to "hallucinate, sweat and make him have a hard time to stop moving." When she returned to the apartment on the night of November 1, she believed T.P. "was high on something."

¶ 18    The court entered written adjudication orders finding that the children were abused or neglected based on a lack of care, an injurious environment, and a substantial risk of physical injury. The orders included findings that the mother was a victim of domestic violence, "the children had marks on them due to child maltreatment," and A.R. had died due to child abuse.

¶ 19    The mother, on February 11, 2020, filed a motion requesting that she be granted unsupervised day visits with the children and noticed the motion for hearing on February 20. She asserted that she had been participating in weekly supervised visits and services.

¶ 20    On February 20, 2020, the court entered disposition orders adjudging the children wards of the court. The court found that the mother was unable for some reason other than financial

circumstances alone to care for, protect, train, or discipline the children; reasonable efforts had been made to prevent their removal; appropriate services had been unsuccessful; and that it was in the children's best interest to remove them from the custody of the mother. The children were placed in the guardianship of the DCFS guardianship administrator. The court also entered permanency orders setting the goal of return home within 12 months because the mother was in need of services including a psychiatric and parenting assessment.

¶ 21    The court did not decide the mother's motion for unsupervised visits. However, on August 20, 2020, in a written order, the court referred the case to the Cook County Juvenile Court Clinic (CCJCC) "for a response consistent with the attached Request for Clinical Information-Child Protection Division (RCI)." In its January 12, 2021, response (CCJCC report), the CCJCC explained that the court, in the RCI, had ordered an assessment "to assist the court with deciding [the mother's] motion for unsupervised day visits and the permanency goal."

¶ 22    On May 26, 2021, the court entered permanency orders changing the goal for the children to substitute care pending court determination on termination of parental rights (TPR). The orders noted that the children were in pre-adoptive foster homes and the mother "has not completed individual therapy and has not taken responsibility for why the case came into the system." Similar permanency orders were entered on December 7, 2021.

¶ 23    On June 23, 2022, the State filed motions for the appointment of a guardian with the right to consent to adoption for each of the children. The motions alleged that the mother was unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)) based on a failure to maintain a reasonable degree of interest, concern or responsibility as to the children (750 ILCS 50/1(D)(b) (West 2022))

(ground (b)), protect the children from conditions in their environment that were injurious to their welfare (*id.* § 1(D)(g)) (ground (g)), and make reasonable efforts to correct the conditions that were the basis of the children's removal during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)) (ground (m)). The motion further alleged that it was in the children's best interests that a guardian be appointed with the right to consent to their adoption.

¶ 24　The court held a fitness hearing on July 7 and September 21, 2023. The State called the only witnesses: Daniel Chandler, who previously worked for Child Link, the monitoring entity, and served as the supervisor of the family's case from 2020 until January 2022 and Karisma Tillis, who was assigned by Child Link as the family caseworker in December 2021. The court took judicial notice of the adjudication.

¶ 25　Before testimony was presented, the State moved for the admission of the CCJCC report as a business record under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2022)). The mother opposed the motion, arguing that the State and the GAL had requested the CCJCC report when she moved for unsupervised day visits and therefore it was made in anticipation of litigation and inadmissible as a business record. The court allowed the admission of the CCJCC report.

¶ 26　The State informed the court and the parties that it was limiting the ground (m) claim to two nine-month periods: August 19, 2020, to May 19, 2021, and May 19, 2021, to February 19, 2022.

¶ 27　Chandler testified that as a matter of practice, Child Link will send minors who have been placed in temporary custody to HealthWorks for medical examinations and will receive the HealthWorks records pertaining to those medical examinations in the normal course of business.

That practice was followed here, and the children were examined by HealthWorks on November 14, 2018. The children's HealthWorks records were admitted during Chandler's direct testimony. According to these records, the examinations revealed that the children's teeth were in decay and they were in need of dental intervention, and the children all had multiple scars and marks on the fronts and backs and many levels of their bodies. The medical conclusion for Jaz. R. was probable for abuse. She was described as very shy and at risk of delay. The conclusions for Jat. R. and B.P. were that they were victims of child abuse. Jat. R. had loop marks and "scars and old burns [were] in a distribution consistent with physical abuse." HealthWorks referred Jat. R. to psychological services after finding that she was very guarded and "at risk for psychological/emotional" issues. B.P. had not yet attended school and had developmental and behavioral problems. The examination revealed "obvious signs of physical trauma," multiple lesions, and "scars in a distribution inconsistent with child play and injuries from fall."

¶ 28    When Chandler became involved in the case in April 2020, the mother had outstanding required services; she had not completed a psychiatric assessment, domestic violence services, and individual therapy. The mother was not allowed unsupervised visits with the children based on an agency staffing, her inconsistent participation in supervised visitations and services, and the findings in the CCJCC report, including a finding that she did not understand how her actions harmed the children. Chandler could not find the mother from August through November 2020; she did not participate in visitations during this period of time.

¶ 29    Chandler concluded that the goal should change to TPR after reviewing the CCJCC report. Chandler was concerned that the mother had not acknowledged the reasons for the case or recognized that her actions caused severe harm to the children.

¶ 30   In the fall of 2021, at an in-person meeting, he reviewed the CCJCC report with the mother. He notified her that the agency was recommending the change in the goal and, as a result, the agency would no longer provide services. The mother was informed that she still needed to engage in domestic violence services, to continue individual therapy, and to complete the psychiatric assessment.

¶ 31   On cross-examination by the GAL, Chandler stated that at his meeting with the mother, he informed her that she would have to redo some of the services that she had already completed because, according to the CCJCC report, she had failed to understand or learn from the services.

¶ 32   On cross-examination by the mother, Chandler said he told her that she would need to pursue community-based services after the goal change. During the time the mother was missing, she gave birth to a child who was in the care of that child's father. When Chandler supervised some of the mother's visits with the daughters, he found her behavior was safe and appropriate.

¶ 33   Tillis testified that since her assignment as the family caseworker in December 2021 she has attempted to communicate with the mother by text or phone almost monthly with little success. In June 2022, the mother texted Tillis to ask about the status of the case. Tillis told her that the goal had been changed to TPR "which led to a brief debacle back and forth" and the mother asserting she would not do any more services. Tillis had no further contact with the mother. The mother communicated only with the case aide who transported the children for visits. The mother has not informed Tillis that she has completed any additional services.

¶ 34   On examination by the GAL, Tillis said that she completed four service plans for the family. The mother was rated unsatisfactory for visitation in the last service plan in March 2023.

¶ 35    On examination by the mother, Tillis testified that she did not refer the mother to any services because the goal was TPR. She had not observed any of the mother's visits with the daughters. The case notes, which were admitted into evidence, indicated that the mother had visits with her daughters on June 3, August 5, and September 2, 2022, which were found to be appropriate. The daughters never voiced any concerns about their visits with the mother. The agency suspended the mother's visitations with the daughters in August 2023. Tillis never offered the mother visits with B.P.

¶ 36    On redirect examination, Tillis explained that, when the goal is TPR, DCFS does not have an obligation to provide services; the parent has the responsibility to pursue community-based services. In June 2022, the mother refused to do any more services. The mother's visitations were found unsatisfactory in the March 2023 service plan because she missed four of the monthly visits in the time-period covered by the report.

¶ 37    The court orally found that the mother was unfit on grounds (b), (g) and (m) and explained its findings. A.R.'s manner of death was homicide, and B.P. was present at the time. The children were found to have multiple scars, lesions, and burn and loop marks. The mother failed to protect the children and did not recognize that they had been abused. Additionally, the mother's participation in supervised visitations with the daughters was found unsatisfactory, and she was never offered unsupervised visits. The mother did not communicate with the caseworker and refused to do community-based services.

¶ 38    The court then proceeded with a best interests hearing, after which the court found that it was in the children's best interests to terminate the mother's parental rights. We need not recite the testimony at the hearing as the mother makes no arguments on appeal regarding the best

interests finding and therefore has forfeited review thereof. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 39    The court entered written orders consistent with its oral rulings after the fitness and best interests hearing. In one order, the court granted the State's motion for the appointment of a guardian with the right to consent to adoption of the children. In termination hearing orders, the court found that the mother was unfit on grounds (b) (lack of responsibility), (g) (failure to protect), and (m) (lack of progress); terminated her parental rights after finding it was in the best interests of the children; and appointed a guardian with the right to consent to adoption. In permanency orders, the court entered a goal of adoption for the children.

¶ 40    On appeal, the mother argues that the findings of unfitness were not supported by the evidence.

¶ 41    The Juvenile Court Act provides a two-step process to involuntarily terminate a parent's rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). After a court finds a parent unfit, it determines whether it is in the minor's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 42    The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the

evidence where the opposite conclusion is clearly evident." *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the trial court regarding credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 43    First, we consider whether the court's finding of unfitness on ground (m)(ii) is sufficiently supported by the evidence. Section 1(D)(m)(ii) of the Adoption Act provides that a parent can be found unfit when she fails to make reasonable progress toward the return of the child during any nine-month period after an adjudication of neglect or abuse. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 24 (citing 750 ILCS 50/1(D)(m)(ii) (West 2014)). Failure to make reasonable progress toward the return of the child is judged on an objective standard, focusing on the steps the parent has taken toward reunification. *Id.* ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)). Reasonable progress is made if the court can conclude that it will be able to order the minor returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). At a minimum, the parent must make demonstrable movement toward the goal of returning the child home. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Failure to comply with an imposed service plan and infrequent or irregular visitation with the minor may support a finding of unfitness under ground (m). *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 44    The trial court adjudicated the children as abused or neglected on November 19, 2019. After the fitness hearing, the court in its termination orders found in part that the mother was unfit under ground (m)(ii) for failure to make reasonable progress during the two nine-month periods from August 19, 2020, to May 19, 2021, and May 19, 2021, to February 19, 2022. If the manifest weight of the evidence pertaining to these two periods (*In re J.L*, 236 Ill. 2d 329, 341 (2010)),

supports a finding that the mother did not make reasonable progress during that time, we may affirm the court's finding as to ground (m)(ii). *D.F.*, 201 Ill. 2d at 495.

¶ 45    The question of whether the evidence sufficiently supports a finding that the mother was unfit under ground (m)(ii) must be answered within the context of the reasons for the children being placed with DCFS and the recommended steps for the mother to achieve reunification with the children. This matter was precipitated by the death of A.R., while the mother was the custodial parent and living with T.P. There was a history of domestic violence in the mother's relationship with T.P. The medical examiner's report relating to A.R.'s death included findings of external signs of trauma (abrasions, contusions, and hemorrhages) to his head, neck, thorax, and abdomen. Additionally, A.R. suffered internal injuries (fractures to several ribs, lacerations to the liver and mesentery, hemorrhages, and blood within the peritoneal cavity). The medical examiner concluded that A.R.'s manner of death was homicide. Upon DCFS taking temporary custody of the children, they were examined by HealthWorks and found to have multiple marks, burns, and scars that were indicative of abuse and their teeth were in decay. The mother underwent an integrated assessment that recommended certain services.

¶ 46    The State submitted the testimony of Chandler and Tillis and the pertinent service plans as to the mother's failure to make reasonable progress toward reunification from August 19, 2020, to February 19, 2022. On appeal, the mother does not claim error in the admission of this evidence, including the references to the CCJCC report in the service plans and the testimony.

¶ 47    First as to visitation, Chandler and Tillis testified that during the entirely of these nine-month periods, although there were no concerns when the mother did visit with the daughters under supervision, her participation in those visits was inconsistent. From August through November

2020, the mother was pregnant and there were medical issues. Chandler described the mother as "missing" and not visiting with the daughters at all during this time. During the relevant nine-month periods, the mother did not achieve unsupervised visits with the daughters due to her inconsistency in supervised visits and failure to acknowledge the harm that had been inflicted on the children. She was not offered any visits with B.P. as his therapist recommended against visits with her.

¶ 48   Additionally, as to services, Chandler testified that when he was assigned to the family in April 2020, the mother still needed to do a psychiatric evaluation, domestic violence services, and individual therapy as recommended by her integrated assessment (IA). These services were still outstanding in the fall of 2021 when Chandler informed the mother of the results of the CCJCC report and the recommended goal change. He also told her she would need to redo some of the services that she had completed. The reengagement in services was required because the mother did not yet have an understanding of the significance of the events that brought the family to DCFS and how her actions affected the well-being of the children. She also had not yet developed factors that were necessary for her to protect the children. When Tillis was assigned to the case in December 2021, the mother did not communicate with her during the time period at issue. The court, in permanency orders entered during these nine-month periods (May 26 and December 7, 2021), found the mother had not completed individual therapy and had not taken responsibility for the removal of the children from her care.

¶ 49   The admitted service plans were supportive of the testimony. In the November 2020 service plan, the mother's overall progress was rated unsatisfactory. The mother was participating in individual therapy and the CCJCC evaluation. The mother had not scheduled a psychiatric

evaluation. She was found unsatisfactory for domestic violence and parenting services and was inconsistent with supervised visitations.

¶ 50    The service plan of May 2021 stated that the mother has not discussed the reasons for the "case opening." According to the plan, the mother has had "limited progress." The mother was participating in individual therapy and mental health and domestic violence services and had been referred to parenting classes. She still had not undergone a psychiatric evaluation. This plan included observations that the mother "has completed services throughout the life of this case but has failed to grasp the ideas and concepts of these services according to the findings in the CCJCC report. She continues to struggle with completing her random drops." The CCJCC report recommended that she reengage in services because of her failure to fully grasp concepts and to develop protective factors for the children. Although the mother missed some supervised visits with the daughters, visits "overall" were consistent. B.P.'s therapist recommended that the mother not visit with him "due to his behavior afterwards."

¶ 51    The November 14, 2021, service plan noted that because the mother had not made reasonable progress in services, there was a goal change to TPR. The agency had no knowledge of whether the mother was currently engaged in any services. This plan rated the mother unsatisfactory in progress as to individual therapy, a psychiatric evaluation, and mental health, parenting, and domestic violence services. She had a satisfactory finding in supervised visits with the daughters but she was still not visiting with B.P. "due to a clinical recommendation."

¶ 52    On this record, the circuit court's finding that the mother was unfit under ground (m)(ii) for failing to make reasonable progress toward the return of the children during the nine-month periods from August 19, 2020, to May 19, 2021, and from May 19, 2021, to February 19, 2022,

was not against the manifest weight of the evidence. The court's finding was supported by the mother's inconsistent visits with the children coupled with her repeated failures during the relevant nine-month periods to complete various services required of her in the aftermath of A.R.'s murder and the discovery that the children had been physically abused. Viewed objectively, the mother's inconsistent visits and her repeated failures to complete the services and to show an understanding of how to prevent her children from being the victims of domestic violence indicates to us that the circuit court would not have been able to order their return to her custody in the near future. Accordingly, the circuit court correctly found the mother unfit under ground (m)(ii) because she did not make reasonable progress during the relevant nine-month periods. See *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 53    Further, the circuit court's additional finding that the mother was unfit under ground (g) for failing to protect the children from conditions in their environment that were injurious to their welfare was not against the manifest weight of the evidence. Evidence in support of a ground (g) unfitness finding focuses on the children's environment and the parent's failure to protect them before their removal. *In re C.W.*, 199 Ill. 2d 198, 214-15 (2002). The evidence here shows that while the children were living with the mother, she was involved in a physically abusive relationship with T.P., who repeatedly hit her, leaving her with bruises. A.R. ultimately was beaten to death. The medical examiner found 12 contusions on A.R.'s head, neck, thorax, and abdomen. After the other children were removed, their medical examinations showed that Jaz. R. had marks and scars on her head, torso, arms, back, and the front and back of her legs, Jat. R. had burns and loop marks on her body consistent with physical abuse, and B.P. had obvious signs of physical trauma and multiple scars in an unusual pattern all over his body. The mother claims she was

unaware of the children's physical abuse, but the prevalence and multiplicity of scars, marks, and bruises on their bodies belies her claim and supports the finding that she failed to protect her children from an injurious environment prior to their removal.

¶ 54    Similarly, the circuit court's finding that the mother was unfit under ground (b) for failing to maintain a reasonable degree of responsibility toward the children was not against the manifest weight of the evidence. A parent is not fit simply because she has shown some interest in or affection for the children. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 50. Rather, the interest, concern, and responsibility must be objectively reasonable. *Id.* The evidence concerning the physical abuse suffered by the children while living with the mother objectively shows that she did not maintain a reasonable degree of responsibility as to their welfare. Further, the mother's noncompliance with her service plans and infrequent or irregular visitation with the children are also sufficient to warrant a finding of unfitness under ground (b). See *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24.

¶ 55    For all the foregoing reasons, we affirm the circuit court's finding of unfitness. The mother argues that the court abused its discretion in admitting the CCJCC report at the fitness hearing because it was made in anticipation of the litigation. We need not address this issue, as the mother's unfitness finding is supported by sufficient unchallenged evidence. See *In re M.H.*, 2020 IL App (3d) 190731, ¶ 21 (remand is unnecessary where evidence is erroneously admitted but there is sufficient other evidence for a finding of unfitness); *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 106 (evidentiary error does not require reversal so long as there is sufficient competent evidence to support the judgment).

¶ 56    Affirmed.

***In re Jaz. R.*, 2024 IL App (1st) 231947**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 18-JA-1099, 18-JA-1100, 18-JA-1101; the Hon. Kimberly D. Lewis, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Christopher J. Williams, of counsel), for appellee. |