2024 IL App (1st) 232140-U

FOURTH DIVISION
Order filed: September 5, 2024

No. 1-23-2140

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| In re Je.R., Ja.R., and N.R., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minors | ) | Cook County. |
| | ) | |
| | ) | Nos. 21JA147, |
| (The People of the State of Illinois, Petitioner-Appellee, | ) | 21JA148, |
| | ) | 21JA149 |
| v. | ) | |
| | ) | Honorable |
| J.R., Respondent-Appellant). | ) | Patrick Murphy, |
| | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Martin and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In a termination of parental rights proceeding, the father's trial counsel's failure to object to hearsay testimony did not prejudice the father when the information contained in the hearsay testimony was also properly admitted through other testimony.

¶ 2    J.R. ("the Father") appeals a circuit court judgment terminating his parental rights to minors Je.R., Ja.R., and N.R (collectively "the Children"). The Father contends that his trial counsel rendered ineffective assistance by failing to object to hearsay testimony at the hearing on his

unfitness to parent the Children and that the evidence did not support the circuit court's conclusion that the termination of his parental rights was in the best interest of the Children. We see no merit to his arguments and affirm.

¶ 3     In February 2021, the State filed petitions for the adjudication of wardship as to each of the Children. At the time, Je.R. was 8 years old, Ja.R. was 7 years old, and N.R. was 5 years old. Each petition contained the same allegations that the Children had witnessed domestic violence at home and had been physically beaten while living with their natural mother, Jac.R., and her paramour. Jac.R. is not a party to this appeal. The petitions named J.R. as each child's father and alleged that his whereabouts were unknown. The State unsuccessfully attempted service on the Father at an address in Chicago. It then published notice by newspaper. The Father did not appear at a temporary custody hearing, and on May 26, 2021, the Father was defaulted for failure to appear. That same day, the Children were adjudicated abused or neglected due to physical abuse and the substantial risk of physical injury. On November 9, 2021, the Children were adjudicated wards of the court and were placed in the custody of the Department of Children and Family Services ("the Department" or "DCFS"), with the circuit court finding that the Father was unable and unwilling to care for the Children. The Department placed the Children in the custody of J.R. Sr. and E.R., the Father's father and stepmother, respectively.

¶ 4     On July 11, 2022, the State filed supplemental petitions seeking to terminate the Father's parental rights as to each of the Children. The State alleged that the Father was unfit to parent the Children on 5 different grounds, including that he had abandoned the Children (750 ILCS 50/1(D)(a) (West 2022)), that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the Children's welfare (750 ILCS 50/1(D)(b)), that he deserted the Children

for more than 3 months preceding the commencement of the termination proceedings (750 ILCS 50/1(D)(c)), that he failed to make reasonable progress towards the return of the Children to him during the 9-month period of May 26, 2021, through February 26, 2022 (750 ILCS 50/1(D)(m)), and that he evidenced an intent to forego his parental rights (750 ILCS 50/1(D)(n)). The State served the Father by certified mail. The Father then appeared in court and admitted paternity of each of the Children.

¶ 5    The circuit court held a hearing on the State's petition over the course of three days. At the outset of the hearing, the parties stipulated to the admission into evidence of 8 documents. Among these were service plans prepared by the Department stating that the Father "has not had any involvement with the case" and "has not had contact with his children in 5 years" and that the Children reported that they did not wish to see the Father. The court then heard the following relevant testimony.

¶ 6    Tasheena Dorris testified that she is a case manager for Child Link. During her time on the case in 2021, she was unable to locate the Father, despite conducting diligent searches every 6 months. Because he never came forward to be assessed, the Father was never referred for any services. Dorris reported that the Children told her that they had not seen their father in many years and did not wish to make contact with him. The Father never reached out to her to ask about the well-being of the Children.

¶ 7    Diane Sanchez testified that she is also a case manager for Child Link and that she took over the case in December 2021. She attempted to locate the Father through a diligent search in May 2022, and the Father eventually made contact with her in June 2022. The Father was assessed for services in August 2022, and, although he was not formally referred for services because the

case goal had already been advanced to termination, it was recommended that the Father engage in individual therapy, parenting classes, and parenting coaching. To her knowledge, Sanchez believed that the Father was able to complete those services. No visitation plan was created for the Father because the Children refused to see him. Sanchez testified that during her time on the case the Father did check on the well-being of the Children, but his contact was inconsistent. Sanchez stated that the Father and his father, J.R. Sr., do not speak to each other. According to Sanchez, the Father was willing to complete services, wanted reunification, and wanted to see his children. Sanchez was aware that the Father had sent gifts to the Children while they were in the custody of his father and stepmother.

¶ 8    E.R. testified that she is the Father's stepmother. The Father had lived with her and her husband from the age of 9 until he was a teenager. After he left their household, the Father remained in contact with E.R. until 2012, at which point they were no longer getting along. E.R.'s most recent contact with the Father was a text message in 2019. E.R. lost track of where the Father was living in 2020. E.R. testified that she and the Father have a "rocky" relationship and had often had disagreements "over the children."

¶ 9    E.R. stated that after the Children were placed in her custody, she made attempts to contact the Father by relaying messages through other family members. E.R. knew that the Father had received her messages because the Father's sister told her that "she was calling to check on the kids, because [the Father] told her that we had custody of the kids, and the kids were living in our home." The Father's counsel did not object to that statement. E.R. never had any direct contact with the Father, and to her knowledge the Father had never reached out to ask how the Children were doing. E.R. testified that she still had the same phone number that she had when the Father

was living with her, and she had lived at the same address since 2012, when she still had contact with the Father.

¶ 10    On cross-examination, E.R. testified that in January 2021 she told the Father's sister, Y.P., that the Children had been placed in their custody. The following exchange then took place:

"Q. Okay. Did you tell [Y.P.] that you just had the kids or that the kids were placed there because of a DCFS case?

A. She already knew the information.

MR. BASTOUNES [(THE FATHER'S ATTORNEY)]: Well, I'm going to object to that and ask that answer --

THE COURT: How do you know she knew the information?

THE WITNESS: She told me.

THE COURT: She told you?

THE WITNESS: When she called me, she told me that -- she told me that she knew that the kids were at my home, because the father told her.

THE COURT: Okay. It's hearsay. I'm not going to permit it in. So I'm going to sustain the objection on that.

MR. BASTOUNES: Well, but -- now I'm intrigued.

THE COURT: Well, if you want to pursue, that is fine.

MR. BASTOUNES: Thank you.

BY MR. BASTOUNES:

Q. Do you know if the father told her the kids were just at the home or that the home -- that they were placed there pursuant to a DCFS active case? Do you know?

A. She told me that he told her that the kids were -- that we had custody of the kids.

Q. Okay.

A. Because the kids were removed from the mother through DCFS.”

The Father's counsel did not object to E.R.'s last two statements.

¶ 11      The State then rested its case, and the Father next testified in his defense. The Father stated that when the case began in January 2021 he was living at an address on West Bernice, where he had lived since the preceding September. The Father had not seen the Children in a long time because their mother would not let him. He knew where J.R. Sr. and E.R. lived, but he was not welcome to visit or call them. According to the Father, he would have his sister, Y.P., reach out to J.R. Sr. several times throughout each year to ask about the Children because the Children's mother would sometimes let them visit with J.R. Sr. and E.R. The Father testified that he did not know that the Children were in the custody of J.R. Sr. and E.R. until he received a letter from Sanchez in July 2022. Sanchez later told him that the Children were living with J.R. Sr. and E.R.

¶ 12      According to the Father, Y.P. did not know that there was an active wardship case until he told her. At that point in the summer of 2022, the Father asked Y.P. to mediate the possibility of him seeing the Children. Y.P. arranged a phone call between the Father, J.R. Sr., and E.R. Despite the conversation, the Father remained unable to see the Children.

¶ 13      According to the Father, over the course of 2021 and the first half of 2022, he attempted to locate the Children by calling the Department directly. He stated that he could not talk to their mother because he did not know how to contact her. The Father expanded on his contact with the Department by testifying that he had called the Department's hotline in the winter of 2019 to report that the Children were being abused. He called the Department a total of six times from 2019 to

2021. However, he stated that he did not see the Children because he did not know where they were.

¶ 14    The Father explained that he did not take legal action to see the Children because, although he was working consistently, he could not afford the cost. He added:

> "I had done some consultations [with attorneys], and due to the fact of my -- my -- the knowledge that I had, they couldn't -- they were unwilling to take the case under the circumstances that I didn't know all the information on what was going on with them, and I had previously stated to them that they were in the DCFS system. So they were like -- they were telling me I had to fully acknowledge what the situation was like in order for them to possibly take my case. Most of the lawyers didn't want to take it under a DCFS circumstance."

When asked by the court whether he had pursued *pro bono* legal services, the Father answered that he had reached out to a few organizations, including Cabrini Green and CARPLS, the latter of which told him that they could not help due to a conflict of interest. When the court asked why he did not file a *pro se* petition, the Father stated, "I have no idea what that even is."

¶ 15    The Father testified that he wanted to see the Children and had contacted Sanchez about visiting with them. However, Sanchez told him that he could not see the Children because they were going through therapy to deal with the abuse they had received and because "they didn't know [him]." He was willing to complete services to try to see the Children, and he located on his own and completed therapy, parenting classes, and life skills classes. He reported those services to Sanchez, who approved and paid for them. The Father also testified that he sent a "car full" of gifts to the Children through Sanchez in the summer of 2022.

¶ 16    The parties then stipulated to the admission into evidence of text message conversations between Y.P. and both J.R. Sr. and E.R. In relevant part, the exhibits showed that in February 2020 Y.P. appears to have sent photos to J.R. Sr. possibly evidencing abuse of the Children, which Y.P. stated the Father had received from the sister of the Children's mother. In March 2020, J.R. Sr. told Y.P. that the Department was involved and visiting the Children once a week, and in May 2020 J.R. Sr. told Y.P. to tell the Father not to get involved because the Department said that "they will charge him for him keep calling for no reason." In January 2022, Y.P. messaged J.R. Sr. that "[the Father] wanted me to reach out to you about the possibility of him seeing his kids." J.R. Sr. responded, "Let me explain[,] the last time he talk[ed] to me or texted me he was threatening me saying he was going to harm me [and] do things to me[.] [H]e is not allow[ed] to come around my home nor call my phone[.] [I]f my wife wants to deal with him that['s] on her[,] but me I don't want nothing to do with him."

¶ 17    The Father then called Y.P. as a witness. She confirmed the authenticity of the text messages and added that she and the Father speak "on and off" and that she and J.R. Sr. are not close.

¶ 18    The final witness, V.M., testified that in January 2022 she sent a Facebook message to J.R. Sr. in which she stated, "from what [the Father] told me, you and your wife have custody of the kids." When asked whether, as the Facebook message indicated, the Father had indeed told her that J.R. Sr. and E.R. had custody of the Children, V.M. confirmed that he had.

¶ 19    Following argument from the parties, during which the court remarked that the Father was "one of the more unbelievable witnesses I have heard in 60 years of practicing law," the court

found that the State had proven that the Father was unfit under grounds (a), (b), (c), and (n). The court began its oral ruling by again explaining that it found the Father to have not been credible:

"I found [the Father] trying to sell me the Brooklyn Bridge, which I ain't about to buy. I've been trying cases since 1965, and I tried cases in every division of the circuit court. I tried them as a criminal lawyer, as a civil lawyer. I tried jury and benches. I tried them in federal court, criminal and civil, jury and bench. And I've seen thousands of witnesses in my day. [The Father] failed every conceivable test."

The court specifically added that it did not believe that the Father had sought *pro bono* legal assistance. The court also noted that "90 percent of my parentage cases were *pro se*. Could he have filed a *pro se* petition, absolutely."

¶ 20　　Addressing the merits of the Father's unfitness, the court found:

"The evidence in this case is that [the Father] stood aside, and first he let the mother do the heavy lifting. Then he let his parents do the heavy lifting. Wasn't a bit concerned. The inferences are he got very concerned when he found out we were going to terminate his rights in the middle of 2022, a year after this case was filed. That's the inferences I draw here.

＊ ＊ ＊

He basically abandoned and deserted these children. He was quite happy to leave the parents raise them, or the mother, someone else do it until this petition was filed."

¶ 21　　At the ensuing hearing on the best interests of the Children, the court heard testimony establishing that J.R. Sr. and E.R. were providing a safe and appropriate home for the Children. There were no signs of abuse or neglect, and the foster parents were attending to the Children's

needs, including certain special needs that require additional services and attention. The foster parents had good interactions with the Children and were very involved in their schooling, where the Children were generally doing well. The Children were comfortable with their foster parents, with whom they have lived for a large portion of their lives, and they did not wish to see their father. The Children's case workers both recommended the termination of the Father's parental rights.

¶ 22     The Father testified that he wanted to be there for the Children but had not been given a chance to care for them. He is currently living with his girlfriend and 2-year-old son. He is employed and believes he is financially capable of caring for the Children. If his rights were not terminated, he hoped to use mediation to integrate the Children into his life.

¶ 23     The court found that the State had proven by a preponderance of the evidence that it was in the best interest of the Children to terminate the Father's parental rights and for the Children to be adopted by J.R. Sr. and E.R. This appeal follows.

¶ 24     We first note that the Father's appellate counsel initially filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), asserting that he could find no issues of arguable merit. We denied the motion without prejudice, observing that the record on appeal was missing certain exhibits presented in the circuit court that counsel should first review and that "there may be an issue of arguable merit regarding trial counsel's failure to object to hearsay evidence regarding what [the Father] told his sisters regarding [the Children's] placement." The Father's counsel then supplemented the record on appeal with the missing exhibits and filed a brief arguing for reversal of the termination judgment on the grounds posited in our order. Specifically, the Father contends that his trial counsel rendered ineffective assistance by failing to object to

alleged hearsay testimony from E.R. regarding what he had said to Y.P. about the Children being placed with E.R. and J.R. Sr.

¶ 25    In Illinois, the involuntary termination of parental rights is a two-step process, as set out in the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2022)). *In re D.T.*, 2017 IL App (3d) 170120, ¶ 16. First, the circuit court must find that the parent is unfit as defined in section 1(D) of the Adoption Act (Adoption Act) (750 ILCS 50/1(D) (West 2022)). In relevant part, section 1(D) of the Adoption Act defines an "unfit person" as one who has either abandoned a child (1(D)(a)); failed to maintain a reasonable degree of interest, concern, or responsibility as to a child's welfare (1(D)(b)); deserted a child for more than 3 months immediately preceding the commencement of an adoption proceeding (1(D)(c)); failed to make reasonable progress towards the return of a child to the parent during any 9-month period following the adjudication of the child as abused or neglected (1(D)(m)(ii)); or intended to forego his parental rights (1(D)(n)). "If the court makes a finding of parental unfitness under section 1(D) of the Adoption Act, the court then considers the best interests of the child in determining whether parental rights should be terminated." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 16 (citing 705 ILCS 405/2029(2) (West 2014)).

¶ 26    Parents in termination of parental rights cases have the right to the effective assistance of counsel, and whether counsel has provided ineffective assistance is evaluated under the same two-prong analysis applied in criminal cases. *In re A.P.-M.*, 2018 IL App (4th) 180208, ¶ 39. "To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance so prejudiced the defendant that but for counsel's errors, the outcome of the

trial likely would have been different." *In re A.J.*, 323 Ill. App. 3d 607, 611 (2001) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "A court need not determine whether counsel's performance was deficient if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Id.* (citing *People v. Albanese*, 104 Ill. 2d 504 (1984)).

¶ 27    The Father in this case argues that trial counsel rendered ineffective assistance by not objecting to two pieces of testimony from E.R. that he contends contained inadmissible hearsay. In the first piece of testimony, E.R. stated, "And [Y.P.] told me she was calling to check on the kids, because [the Father] told her that we had custody of the kids, and the kids were living in our home." In the second comment, E.R. was asked, "Do you know if the father told [Y.P.] the kids were just at the home or that the home -- that they were placed there pursuant to a DCFS active case?," to which E.R. responded, "[Y.P.] told me that [the Father] told her that the kids were -- that we had custody of the kids. *** Because the kids were removed from the mother through DCFS."

¶ 28    The Father contends that these two pieces of testimony contained inadmissible hearsay and provided the only evidence that he was aware of the active DCFS case prior to his first involvement in July 2022. This is significant, he contends, because his knowledge of the active DCFS case in January 2022 supported all four grounds of unfitness that the court found that the State had proven. The State responds that counsel's failure to object was a matter of trial strategy and, therefore, not susceptible to a claim of ineffective assistance, or alternatively that the other evidence was nonetheless sufficient to support the court's finding that the Father was unfit. We agree with the State's latter point that the Father was not prejudiced by counsel's alleged deficiency.

¶ 29    Initially, we note that we would be justified in finding that the Father has forfeited his ineffective assistance argument by failing to engage in any analysis explaining why the testimony at issue was inadmissible and by failing to support the argument with any citations to authority. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to contain "the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on"). Instead, in his brief the Father simply declares that the testimony is hearsay and then moves on to addressing why the admission of the alleged hearsay prejudiced him. We admonish counsel that, "[w]here an appellant has failed to support his or her arguments with citations to authority, this court will not research the issues on the appellant's behalf." *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19; see also *Skidis v. Industrial Comm'n*, 309 Ill. App. 3d 720, 724 (1999) ("Statements unsupported by argument or citation to relevant authority will not be considered, and this court will not become the advocate for, as well as the judge of, points an appellant seeks to raise."). However, due to the important rights at stake, we will consider the Father's argument.

¶ 30    The Father's conclusory assertion that the statements at issue contained inadmissible hearsay appears to be correct. Both of the complained-of pieces of testimony involved E.R. relaying statements from Y.P. regarding what Y.P. had been told by the Father. The Father's statements to Y.P. likely qualified as a statement by a party opponent under Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015), and were, therefore, not hearsay (although that issue is somewhat clouded by the fact that it was the Father's own counsel who brought out the statements). However, Y.P.'s statements to E.R. regarding what the Father said were out-of-court statements offered for the truth of the matter asserted, making them hearsay (see Ill. R. Evid. 801(c)), to which no exception would seem to apply. Y.P.'s statements to E.R. were, therefore, inadmissible.

¶ 31    The State responds that counsel's failure to object to the hearsay statements did not amount to deficient performance because counsel's inaction may have been a conscious exercise of trial strategy. See *People v. Clark*, 160 Ill. App. 3d 877, 883 (1987) ("The decision of when to object to evidence is purely a matter of trial strategy."); see also *People v. Heard*, 187 Ill. 2d 36, 56 (1999) ("[T]he strategic decisions of trial counsel are generally protected by a strong presumption that the attorney's decisions reflect sound trial strategy rather than incompetence."). The State theorizes that counsel may have viewed the testimony as beneficial to the Father's case because it showed that the Father was reaching out and showing an interest in the Children. However, we need not decide this issue because we can more easily determine that the Father was not prejudiced by the alleged deficiency.

¶ 32    The Father contends that the admission of the hearsay testimony prejudiced him because it showed that he knew there was an active DCFS case in January 2022 but still did not get involved until July 2022, thereby evidencing abandonment, failure to maintain a reasonable degree of interest, concern, or responsibility as to the Children's welfare, desertion, and an intention to forego his parental rights. He argues that the hearsay testimony was the only evidence that he knew about the DCFS case prior to July 2022 and was, therefore, central to the court's finding of unfitness.

¶ 33    However, contrary to his contention, the record does contain at least two other pieces of evidence establishing that the Father knew months before he got involved that the Children had been removed from their mother's care. First, in January 2022, Y.P. sent a text message to J.R. Sr. stating that "[the Father] wanted me to reach out to you about the possibility of him seeing his kids." Second, V.M. sent a Facebook message to J.R. Sr. in which she stated that, "from what [the

Father] told me, you and your wife have custody of the kids," and she confirmed in her testimony that the Father had told her in January 2022 that the Children were in J.R. Sr. and E.R.'s custody. Both of these pieces of evidence established that the Father knew that the Children had been removed from their mother's care and were in the custody of his father and stepmother as early as January 2022, six months before he got involved in the case in July 2022. It is true that Y.P.'s text message arguably suffers from the same hearsay defect that the Father raises regarding E.R.'s testimony, but he has not made that same argument regarding the text message. And even if we were to similarly disregard the text message as being inadmissible hearsay, V.M.'s testimony that the Father told her about the Children's whereabouts did not suffer from that same infirmity. Rather, she gave direct testimony that the Father told her that the Children were in the custody of his father and stepmother. Accordingly, there was other evidence aside from the inadmissible hearsay establishing the Father's knowledge of the case in January 2022. Therefore, counsel's failure to object to the hearsay testimony did not prejudice the Father.

¶ 34     In his second issue, the Father challenges the circuit court's conclusion that the termination of his parental rights was in the best interest of the Children. His argument on this point is again scarce and consists of bare assertions that termination was not in the Children's best interests because it was the mother's misconduct that prompted the DCFS case and because the Children would be cut off from the Father's extended family, whom the Children had expressed a desire to see. His minimal argument on this issue, such that it is, is unpersuasive.

¶ 35     "At the best-interest stage of termination proceedings the State bears the burden of proving by a preponderance of the evidence that termination is in the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing *In re D.T.*, 212 Ill. 2d 347, 366 (2004)).

"When determining whether termination is in the child's best interest, the court must consider, in the context of a child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *Id.* (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"We will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* (citing *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004)). "A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result." *Id.* (citing *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002)).

¶ 36    The Father does not address any of the statutory factors and does not explain how they militate in his favor. However, given that the evidence presented at the best-interests hearing demonstrated that the Children were well-cared-for in their foster parents' custody, the Children had lived with the foster parents for a significant portion of their lives, the Children had a positive relationship with their foster parents, and the Children had virtually no relationship with the Father, whom they had not seen in many years and did not wish to see, we cannot say that the court's conclusion that termination was in the Children's best interests was against the manifest weight of the evidence.

¶ 37 For the foregoing reasons, we affirm the judgment of the circuit court terminating the Father's parental rights to Je.R., Ja.R., and N.R.

¶ 38 Affirmed.