NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231238-U

NO. 4-23-1238

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 28, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|    Petitioner-Appellee, | ) | No. 21JA26 |
|    v. | ) | |
| Albert R., | ) | Honorable |
|    Respondent-Appellant). | ) | Derek G. Asbury, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court's determination that it was in the minor's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2  In April 2022, the State filed a petition to terminate the parental rights of respondent Albert R. to his minor child, S.R. (born in 2021). In September 2023, the trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS 50/1 (West 2022)) and that termination of respondent's parental rights was in S.R.'s best interest. Respondent appeals, arguing the court's best interest determination was against the manifest weight of the evidence. We affirm.

¶ 3           I. BACKGROUND

¶ 4  Respondent and Champaine W. are the biological parents of S.R., and both were parties to the proceedings below. Champaine W. has separately appealed the termination of her

parental rights in appellate court case No. 4-23-1237. Accordingly, this disposition is limited to respondent's claims on appeal.

¶ 5                              A. The Petition for Adjudication of Wardship

¶ 6              In January 2021, the State filed a petition for adjudication of wardship. The State alleged S.R. was neglected because she lived in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2020)). Specifically, the State alleged that Champaine W. (1) consumed alcohol throughout her pregnancy and stopped just two weeks before giving birth to S.R., resulting in S.R. suffering from microcephaly; (2) had not properly addressed her substance abuse issues; (3) repeatedly contacted the police regarding her other children, including at least four times in October 2020; (4) was involved in numerous incidents of domestic violence involving respondent and her other children; (5) was twice involved with intact family services; and (6) was "indicated" by the Illinois Department of Children and Family Services (DCFS) four times prior to the initiation of the instant case. The petition alleged that respondent was aware of Champaine W.'s drinking during her pregnancy, that he struck her with an open hand and was facing pending charges of domestic violence, and that he had been "indicated" by DCFS prior to the initiation of the instant case.

¶ 7              In April 2021, the trial court adjudicated S.R. neglected (705 ILCS 405/2-3(1)(b) (West 2020)). At the dispositional hearing held the same day, the court found respondent unfit for reasons other than financial circumstances alone to care for S.R., made her a ward of the court, and placed her guardianship and custody with DCFS. The court found respondent's "substance abuse issues, domestic violence, prior indicated findings of risk of physical injury, and failure to demonstrate care and concern during visits" formed the bases for his unfitness.

¶ 8                              B. The Petition for Termination of Parental Rights

¶ 9          In April 2022, the State filed a petition to terminate respondent's parental rights. The State alleged that respondent was an unfit person within the meaning of the Adoption Act for failing to make reasonable progress toward the return of the minor during the nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)). The State alleged a nine-month period of June 22, 2021, to March 22, 2022.

¶ 10                    1. *The Fitness Portion of the Termination Proceedings*

¶ 11          In June 2023, after numerous continuances, the trial court began the hearing on the fitness portion of the termination proceedings. In August 2023, after hearing additional testimony, the court took the matter under advisement. At a hearing in September 2023, the court found respondent to be unfit as alleged in the State's termination petition. The matter then proceeded to a best interest hearing.

¶ 12                    2. *The Best Interest Portion of the Termination Proceedings*

¶ 13                         a. The State's Evidence

¶ 14          As reflected in the best interest report and testimony of Lutheran Social Services of Illinois child welfare specialist Kayla Hanten, S.R.'s foster mother, Marisa W., was able, willing, and committed to provide permanency to S.R. through adoption. S.R. had been with Marisa since August 2022. S.R. and Marisa had developed a significant parent-child bond. Marisa met S.R.'s food, shelter, health, and clothing needs. Hanten observed the home to be safe and with adequate space, and S.R. had an appropriate sleeping space in the home. S.R. was continuing to attend Eastside Educational Center.

¶ 15          Respondent and S.R. were observed to be bonded. However, respondent had been unsuccessfully discharged from domestic violence classes several times by the time of the best interest hearing. This was especially concerning given that respondent's history with domestic

violence was a significant reason for S.R. coming into foster care. Respondent had not completed a drug test since June 2023. Respondent had been unsuccessfully discharged from individual counseling several times and had resumed participation in this service. However, Hanten wrote that "the agency continues to have concerns regarding [respondent's] [ability to] apply learned skills and techniques in therapy to his interactions outside of that environment." Hanten believed it was in S.R.'s best interest that the trial court terminate respondent's parental rights and change the permanency goal to adoption.

¶ 16    Respondent was consistently attending visits and S.R. was happy to see him "when he's in a good mood." Respondent had been observed "get[ting] in the case aide's face." On one occasion, respondent "was upset at [S.R.'s] appearance" and "threw her shoes in the garbage." Respondent "just went on about how he didn't think that [S.R.] was in appropriate clothing." The case aide requested respondent "pick up the room" and he became angry and started yelling at the case aide. Respondent "was telling [S.R.] not to help pick up and then he did report that he wasn't leaving the agency without his daughter and tried taking her home." Respondent relented when the supervisor intervened and warned they would have to call the police if respondent did not give S.R. back to the case aide. Hanten testified to receiving "a couple reports" from the case aide of respondent potentially smelling of marijuana and swaying and slurring his words during visits.

¶ 17                              b. Respondent's Evidence

¶ 18    Respondent testified that his bond with S.R. is "[p]riceless" and she wants to go home with him. According to respondent, S.R. does not "ever want to leave" her visits with him. They both cry and S.R. says, "daddy, no." Respondent brings food, clothes, shoes, and hair products for S.R. at every visit. Respondent justified throwing S.R.'s shoes away during a visit because he had bought her five pairs of shoes but never saw her wear them, and he was "tired of

seeing" the ones she did wear. Respondent denied attempting to take S.R. from the agency during a visit. Instead, respondent explained he tried to move S.R. to the foyer because the room where the visit was to take place contained no toys and had a large table on which she could hit her head. Respondent had not been allowed visits with S.R. either at his home or in the community "[b]ecause they said I haven't did this and that and this and that." Respondent stated he was completing drug tests consistently after the time period relevant to his unfitness. Respondent did not complete domestic violence classes because he "couldn't get there" but was still engaging in individual counseling. Respondent denied being under the influence of marijuana or alcohol during visits. Respondent was living with, and caring for, his mother in a three-bedroom house which he felt was appropriate for S.R. to live in. Respondent was employed full-time as a steelworker and had medical and dental benefits with that job.

¶ 19    Respondent announced he had videos on his cell phone of his interactions with S.R. during the last several visits, as well as from the previous two years. The trial court allowed respondent to confer with his attorney about showing the videos without having to admit his cell phone into evidence. After a recess, the court confirmed that the parties were able to view the videos respondent wished to show. The court observed the videos and described its observations on the record.

¶ 20    The trial court first viewed a video from June 30, 2023, which was taken outside and showed S.R. on a swing set smiling and eating a sucker. Respondent said he loved S.R. and pushed her on a swing.

¶ 21    The trial court then viewed a video from June 23, 2023. Respondent was seen playing games and "peekaboo" with S.R. and making various animal noises, prompting S.R. to

laugh. Respondent and S.R. were shown kissing and rubbing heads. Respondent also gave S.R. a sucker.

¶ 22 The next video the trial court viewed was from July 21, 2023. Champaine W. is seen doing S.R.'s hair and S.R. is once again eating a sucker. Champaine W. is heard speaking to respondent about a dream she had.

¶ 23 The final video was from September 15, 2023. It showed respondent kissing S.R. on the cheek while she ate gummy worms. Respondent called S.R. a "sweetheart" and "Daddy's baby." S.R. was giggling and smiling and appeared content.

¶ 24 After viewing the videos, the trial court stated, "[a]s to all the videos, the interaction was appropriate. [S.R.] seemed to enjoy her time with her parents, and enjoy her time with him is how I would summarize all of them."

¶ 25 c. Additional Testimony of Kayla Hanten

¶ 26 Hanten was recalled to the stand and testified she never witnessed S.R. cry at the end of a visit and was not aware if S.R. had ever done so. Respondent requested visits with S.R. out in the community, but none had ever been set up due to him not completing his drug tests. Despite being requested to do so, respondent never provided identification information about his mother to the agency so it could do a background check.

¶ 27 d. The Trial Court's Decision

¶ 28 The trial court acknowledged this case was "certainly difficult not, I would say, because of an evidentiary standpoint but the videos particularly." The court stated the videos "didn't seem contrived" and S.R.'s "interaction with the father and the mother is very natural and loving. I mean, there's clearly a bond." The court noted S.R. had spent approximately half her life in foster care and that "the heavy lifting" of providing shelter, food, medical care, and education

had been done by her foster parent. The court found the State proved by a preponderance of the evidence it was in S.R.'s best interest to terminate respondent's parental rights and changed the goal to adoption.

¶ 29    This appeal followed.

¶ 30                            II. ANALYSIS

¶ 31    On appeal, respondent argues the trial court's best interest determination was against the manifest weight of the evidence. Specifically, respondent maintains the court gave too little weight to the best interest factors where the evidence overwhelmingly showed he had a bond with S.R.

¶ 32    Under section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit" as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). "If the trial court finds the parent to be unfit, the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. The preponderance of the evidence standard is a less stringent standard than proof beyond a reasonable doubt; it is less stringent than even the intermediate standard of clear and convincing evidence. *In re K.P.*, 2020 IL App (3d) 190709, ¶ 41 (citing *People v. Peterson*, 2017 IL 120331, ¶ 37).

¶ 33    In evaluating a child's best interest, the trial court must consider the following statutory factors:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); (citing 705 ILCS 405/1-3(4.05) (West 2004)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the child[ ]'s best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 34         "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Other factors, such as "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures" (705 ILCS 405/1-3(4.05)(g) (West 2022)), may

properly be considered. The evidence in this case shows the statutory factors favor terminating respondent's parental rights.

¶ 35　　　　　Here, S.R. had spent approximately half of her life in her current placement. The evidence showed Marisa, who was S.R.'s foster mother since August 2022, was meeting S.R.'s food, shelter, health, clothing, medical, and educational needs and was willing, able, and committed to providing permanency to S.R. through adoption. The evidence also showed respondent had been unsuccessfully discharged from domestic violence classes several times, even though domestic violence was a significant factor behind S.R. coming into foster care. Additionally, respondent had not completed a drug test since June 2023 and the agency had ongoing concerns with respondent's ability to apply skills learned through individual counseling.

¶ 36　　　　　Respondent argues "[t]he evidence shows an overwhelming bond and sense of love" between him and S.R. Indeed, the trial court, referring to the genuine nature of the bond it observed in the videos, acknowledged it made the best interest determination difficult. However, while a genuine bond of love between S.R. and respondent may exist, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The law is clear that the existence of a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990). The court's finding that termination of respondent's parental rights was in S.R.'s best interest was well-supported by the record. As such, we cannot say that the opposite conclusion to the one reached by the court here was clearly evident. *C.N.*, 196 Ill. 2d at 208.

¶ 37    In sum, considering all the evidence at the best interest hearing and the relevant statutory factors, we conclude that the trial court's finding that termination of respondent's parental rights was in S.R.'s best interest was not against the manifest weight of the evidence.

¶ 38                            III. CONCLUSION

¶ 39    For the reasons stated, we affirm the trial court's judgment.

¶ 40    Affirmed.