2025 IL App (1st) 240866-U

FIFTH DIVISION
January 10, 2025

No. 1-24-0866

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* J.M., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 19 JA 329 |
| v. | ) | |
| | ) | |
| TT W., | ) | Honorable |
| | ) | Patrick T. Murphy, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Mitchell and Navarro concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   (1) Respondent fails to connect any errors with respect to the permanency hearings in this case to the ultimate termination of her parental rights, so the alleged permanency hearing errors are not reviewable; (2) the trial court's unfitness findings were not against the manifest weight of the evidence; (3) the trial court did not substantively conflate the unfitness portion of the termination hearing with the best interests portion, and therefore respondent was not deprived of a fair trial; and (4) because there was no error, there was no cumulative error.

¶ 2    Respondent TT W. is the natural mother of the minor J.M. On April 17, 2024, after a hearing, her parental rights as to J.M. were terminated. On appeal, TT argues that the trial court

(1) deprived her of due process by failing to timely set permanency placement goals for J.M. and by failing to explain in writing the reasons why those goals were chosen over other goals, (2) erred in finding the State proved by clear and convincing evidence that she was unfit under both ground (b) and ground (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)), (3) deprived her of a fair trial by conflating the fitness and best interests portions of the termination hearing, and (4) deprived her of a fair hearing as a result of its cumulative errors. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      J.M. was born on December 17, 2018, to his mother, TT, and his father, Andrew M., who is not a party to this appeal. TT herself was removed from the care of her biological mother when she was 11 months old and adopted by Annie W. when she was six years old. TT reported that she, her three older siblings, and her parents all had a history of mental illness, including diagnoses of bipolar disorder and schizophrenia. TT also reported that there was domestic violence and physical abuse in her adoptive home. TT was only 14 years old when Annie died. TT spent time with her adoptive cousin and in a shelter before she was eventually placed with foster mother Ella S., where she remained for approximately five years.

¶ 5      On February 1, 2015, when TT was 18 years old, she gave birth to J.M.'s older half-sibling, J.R. The State petitioned for an adjudication of wardship and moved for temporary custody of J.R. after an incident on October 31, 2017, when TT, who was homeless and had no adequate care plan for her son, was arrested for battery. DCFS was involved with the family from that point on, but TT did not inform her case worker Danicka Williams when, on December 17, 2018, she gave birth to J.M. An integrated assessment that was prepared reported that, according to Ms. Williams, TT was unstable and had a history of mental health issues and domestic violence. The integrated

assessment also reported that TT "was in and out of compliance with medication monitoring and services." TT's parental rights as to J.R., her first child, were terminated on March 2, 2022.

¶ 6                    A. The Adjudication, Disposition, and Permanency Hearings

¶ 7     On April 4, 2019, after DCFS learned that TT had given birth to a second child, the State petitioned for an adjudication of wardship and moved for temporary custody of J.M. The State alleged that J.M. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (see 705 ILCS 405/2-3(1)(b) (West 2018) (a minor is neglected if his "environment is injurious to [his] welfare")) and abused pursuant section 2-3(2)(ii) (*id.* § 2-3(2)(ii) (a minor is abused where someone "create[d] a substantial risk of physical injury to [him] by other than accidental means which would cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function")).

¶ 8     As a basis for the requested relief, the State alleged that J.M.'s mother, TT, had two prior indicated reports of neglect based on a substantial risk of physical injury/environment injurious to health and welfare and one other minor in DCFS custody under a finding of neglect. The State further alleged that TT had a history of domestic violence, had been diagnosed with schizoaffective disorder, and had a history of non-compliance with her prescribed psychotropic medication. She had not followed up with her psychiatrist's recommendation to return within 30 days of January 28, 2019, and was still in need of several services, including individual therapy, psychiatric services, random urine drops, and domestic violence services. The State explained that because TT had been unwilling to reveal where she resided with this minor, the home had not been assessed. The State alleged that reasonable efforts could not prevent or eliminate the need for J.M. to be removed from TT's care.

¶ 9     Following a hearing that same day, the court ordered J.M. to be removed from TT's care

and granted temporary custody of J.M. to DCFS with the right to place him. J.M. was placed in a traditional foster home on April 2, 2019, then was moved to a fictive kin placement—TT's former foster mother—where TT also resided, on April 5, 2019. J.M. has remained in that home throughout these proceedings.

¶ 10    On October 4, 2019, the trial court entered an order of adjudication, finding J.M. was abused or neglected due to an injurious environment. On December 2, 2019, after a dispositional hearing, the court adjudged J.M. a ward of the court, on the basis that TT was unable to care for him. J.M. was placed in the guardianship of the DCFS guardianship administrator with the right to place him.

¶ 11    A series of permanency orders were entered by the court starting on January 16, 2020. In that first order, instead of selecting a permanency goal, the court wrote "reserved" over the goals on the form order. The only reasoning for this offered by the court was that the "[m]inor [wa]s one year old in a safe and appropriate fictive kin placement willing to offer permanency" and "[m]other [was] engaged in services, visits supervised." The court entered the next permanency order on January 13, 2021, and again did not select a permanency goal, instead indicating, "all permanency findings reserved." The court did find, however, that DCFS had "made reasonable efforts in providing services to facilitate achievement of the permanency goals."

¶ 12    On March 30, 2021, the court entered another permanency order, for the first time selecting a goal of return home within five months. As the reasons for that goal, the court order says, "see transcript of ruling." No transcript of the hearing is included in the record on appeal.

¶ 13    The court changed the goal on October 27, 2021, to private guardianship because "[p]arents ha[d] not made substantial progress towards return home of the minor. The foster parent (who [is] fictive kin) desire[s] to become the private guardian and prefer not to terminate the minor's

4

biological ties." The court maintained this same goal in its April 11, 2022, and January 27, 2023, orders.

¶ 14   The court changed the permanency goal again on January 26, 2024, to "substitute care pending determination on termination of parental rights," stating, "[M]inor is five years old in a safe and appropriate pre-adoptive home and has been in substitute care for nearly five years, foster parent no longer wants private guardianship but now wishes to adopt—neither mother nor father have progressed sufficiently for reunification."

¶ 15   On February 20, 2024, the State filed a motion to terminate TT's parental rights, pursuant to grounds (b) ("[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare") and (m) (failure "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period" following an adjudication of abuse or neglect) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)). The State specified the nine-month periods for ground (m) as October 4, 2019, through July 4, 2020; July 5, 2020, through April 5, 2021; and January 27, 2021, through October 27, 2021.

¶ 16                              B. The Termination Hearing

¶ 17   The trial court held the termination hearing on April 17, 2024.

¶ 18                              1. Fitness Portion of the Hearing

¶ 19   At the fitness portion of the termination hearing, the parties stipulated to a business records foundation for 21 exhibits the State sought to enter, specifically "that these records were made in the regular course of business at the agency which made them on or about the same time that the events occurring—on the records occurred or within a reasonable time thereafter." The stipulation cited the business record exception found in section 2-18 of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2022)).

¶ 20    Those exhibits included an integrated assessment, a parenting capacity assessment, a copy of the order terminating TT's parental rights for J.M.'s sibling, J.R., and service plans from May 2019 through January 2024, dated approximately every six months. Until August 2021, the service plans had a goal for J.M. of return home within 12 months. In August 2021, it was changed to return home within five months. The goal was changed again in February 2022, to guardianship, and that remained the goal until September 2023, when it was changed to substitute care pending court determination on termination of parental rights. Each service plan listed steps necessary for TT to achieve the stated goal, recommended services, and evaluated her progress on each step or service.

¶ 21    The State called David Lyons, J.M.'s DCFS case manager from August to September 2021. Mr. Lyons was shown an August 2021 service plan rating TT "unsatisfactory" for not "refraining from criminal activity." He explained that in February 2020, TT was involved in a physical altercation where she attacked the father of one of her children, and in December 2020, TT visited the home of Ella, J.M.'s caregiver, and "[p]olice were called because of [TT] having mental health issues and trying to fight people in the home." Despite being in therapy and participating in domestic violence counseling, TT "still was having domestic violence issues in the caregiver's home, attacking the dad." TT was rated "satisfactory" for complying with her psychiatric evaluation, but unsatisfactory for attending mental health appointments. Mr. Lyons also explained that TT had "issues *** complying with medication." Given all of this, Mr. Lyons said that the agency was not recommending that J.M. have unsupervised visits with TT.

¶ 22    Foster mother Ella S.C. then testified. TT became Ella's first foster daughter at the age of 12, and J.M. had been Ella's "foster grand baby" since he was six months old.

¶ 23    Ella described an incident that occurred at her home on December 25, 2020: she and TT

had a disagreement because TT was attempting to give J.M.'s birthday gifts to J.R. for Christmas. That led to TT spraying mace in the air and Ella calling the police. At the time, J.M. was in the other room and Ella had taken J.R. outside. The incident affected TT's visitation with J.M. "[f]or a minute" because Ella "needed a break." TT apologized to Ella, and Ella allowed her to resume visitation with J.M.

¶ 24    In September 2023, however, TT and Ella argued over an issue with another foster child living in the home, prompting TT to call DCFS. Ella said: "I feel like every time we get to the point where it is going to either get ready to close this case, or she knows that, [TT] puts in a phone call to put the house on hold again."

¶ 25    Ella said TT sees J.M. and "does what she's supposed to do," buying J.M. everything "for Christmas, birthdays, school," and the bulk of his clothes. Ella did not stop TT from seeing J.M. and said that TT was employed, was living down the street from Ella, and was appropriate during visits at the time of the hearing because she was taking her medicine and had been doing so consistently for about the one year preceding the hearing.

¶ 26    On cross-examination by J.M.'s attorney, Ella recounted how, she believed in 2022 or 2023, TT was late bringing J.M. back from an unsupervised visit, explaining that she had no money for the train. Ella called Danicka, TT's caseworker, but TT would not tell Danicka where she was. Ella eventually tracked TT by her cell phone, went to the apartment where TT was, and told TT to bring the baby down, which she did. TT arrived at Ella's house the next day and damaged the door. Ella said, "I had to call the police because she wanted to tell them that I had kidnapped the baby."

¶ 27    The court asked if Ella knew why TT was not in court that day. Ella said, "She told me, mom, I'm not coming for them to take my rights away. They already took [J.R.] rights away. I'm not coming today for that. I can't take that today." In response to more questions from the court,

Ella said she talks to TT every day and she is like her mother.

¶ 28    The following exchange then occurred:

"[THE STATE]: Judge, I have no further questions at this time for our foster parent. But in the event we have a best interest hearing, I will need her.

THE COURT: Ma'am, I don't know what's going to happen in this case. But if we terminate rights, would you want to adopt the child?"

[ELLA]: Most definitely.

THE COURT: Okay. I can tell it's because you love the child and you raised the child and you consider the child a part of [your] family; is that right.

[ELLA]: Correct.

THE COURT: And you consider TT part of your family too?

[ELLA]: Yes. I love TT

THE COURT: Okay. Well, you're a good woman, ma'am, and you're doing good work. I appreciate it.

[ELLA]: No problem.

THE COURT: She can leave. There's no reason for her to stay."

¶ 29    None of the lawyers made any objection or request to the court at that point, and Ella left while the fitness portion of the hearing continued.

¶ 30    The State next called Jamie Myers, the program director at Lutheran Child and Family Services. Ms. Myers testified that she supervised J.M.'s case from 2018 to about 2021, during the time that his case manager was Danicka Williams. Ms. Myers met with Ms. Williams monthly and signed off on and approved the integrated assessment Ms. Williams created for J.M. Services recommended for TT included individual therapy, a psychiatric assessment, psychiatric

monitoring, random urine screens, and services related to domestic violence. Ms. Myers was satisfied with Ms. Williams's referrals for those services. Ms. Myers said she recalled a time during which the agency had recommended unsupervised visits between TT and J.M., but said that such visits had terminated by 2021. Ms. Myers explained that TT "would be bringing the child back late. Foster parent was having issues, complaints, and then she was still having violent issues during the—violence during the visits."

¶ 31    Ms. Williams testified next, explaining that she was the worker on J.M.'s case from October 2017 until April 2021. She made referrals for TT that included a psychiatric evaluation, monthly psychiatric treatment and medication, individual therapy, a parenting class, the Nurturing Parenting Program, psychotherapy—which she said was like parent coaching—and random urine screens. Ms. Williams said TT was also supposed to obtain stable housing, participate in supervised visitation with both children, and undergo a parenting capacity assessment.

¶ 32    Ms. Williams said she met with TT one-on-one from approximately 2018 to April 2021 "[s]ometimes on a weekly basis." She had concerns about reports of TT's frequent violent behavior. Although the agency recommended unsupervised visitation by April 2021, a return home was not imminent at that time because TT "would make progress, and then would shortly regress." Ms. Williams explained, "[T]here w[ere] just so many incidents of her violent behavior and poor decision making. That was the biggest concern." Ms. Williams discussed the time TT would not bring J.M. back to Ella, which she said occurred in 2021, toward the end of her tenure, saying, "[T]here was an incident where [TT] had [J.M.] for a long period of time, more than what she was approved to have, and it was concerning because she wouldn't tell me or the foster parent initially where she was with the child that day." And then later, according to Ms. Williams, TT called to say that "she couldn't return him because she didn't have money to return him. And the foster

parent had to leave out late at night to go get the child in a community where she was not comfortable."

¶ 33    Ms. Williams said she rated TT unsatisfactory "in some of her service plans." Ms. Williams said, for example, "there was a period of time when she was not consistent with taking her psychotropic medication," which was "definitely the most important recommendation that we needed her to adhere to." By the beginning of 2021, Ms. Williams said TT "was pretty much consistent with engaging in services. However, there was still a concern about her judgment and her behavior." Ms. Williams explained, "[A]lthough she did engage in the services that were recommended for her, I can't honestly say that she was making significant progress in those services, because her behavior had not changed." TT "still exhibited violent behavior often," and a return home was still not imminent.

¶ 34    On cross-examination by TT's attorney, Ms. Williams agreed that J.M. did not suffer physical harm during his visits with TT. She also agreed that at times the monthly bus cards the agency provided to TT ran out. During the visits she observed, Ms. Williams said TT was appropriate with J.M. and J.M. was bonded with TT. He was happy to see her and not afraid of her. Ms. Williams also agreed that TT completed a service at the Center for Domestic Peace, and Ms. Williams did not refer her for another domestic violence service because she believed TT's therapist would work with TT on the domestic violence issues and on making better decisions.

¶ 35    The State rested, and neither the parents nor J.M.'s attorney presented any witnesses.

¶ 36    After the parties presented argument, the court ruled as follows:

> "I find by clear and convincing evidence that the rights should be terminated. This is a case where—and you see it frequently in this courtroom, where a child goes to live with a grandparent or aunt or close friend of the parent, and the parent makes no progress

or very little progress because they're relying on the grandmother to basically do the heavy lifting. And they know they can come by at any time and be the parent, because the foster parent, in this case surrogate mom, permits it. And as a result, they just rely on them.

And what happened here is, in my judgment, [TT] *** relied on the grandmother to do all the heavy lifting. They didn't have to, you know, do all the stuff a good parent does. They could come by and be the kindly uncle and aunt and take the kid out without having to deal with the issues that little kids have.

So they never made progress. They made slight progress, but not any substantial progress. And I make that finding by clear and convincing evidence.

It would have been helpful if [TT] appeared, and then the record will reflect I really bent over backwards trying to assist her. But it would have helped if she came in and testified to rebut the evidence.

Certainly the evidence stands by itself. But [TT]'s sworn testimony could have acted as a rebuttal as to why she didn't make progress and why she relied on [Ella] to be the parent. But that's what happens in this case. The case is an old case, by our standards. So it's time to move on."

¶ 37 The State asked to clarify which grounds the court was making its finding on, and the court said, "All grounds named." The State then clarified that that meant ground (b) and ground (m) for TT, and the court said, "That's right." The State then asked about Ella's testimony with the court:

"[THE STATE]: Thank you, Judge. And also to clarify, you are not relying in any way on the foster parent's statements in any way dealing with best interest?

THE COURT: I'm sorry?

[THE STATE]: The foster parent did testify regarding some best interest portions.

11

THE COURT: Yeah. But that was taken out of turn, so she can go home.

[THE STATE]: To accommodate her. Thank you for clarifying.

THE COURT: We're not relying on the fact—basically in this case, and I've been involved in the case, is that [TT] *** has made no progress. Relied on [Ella] to be the mom. And they were happy to be the happy—to be the kindly uncle and aunt, without making any progress and doing the heavy lifting.

[THE STATE]: Thank you, Judge. We're ready for a best interest hearing.

THE COURT: Okay. I've heard from the foster mom.

[THE STATE]: And Judge, I do ask you specifically to take judicial notice of that testimony that you already elicited to accommodate the foster mother for the purposes of best interest. And also the unfitness findings in evidence."

¶ 38                    2. Best Interests Portion of the Hearing

¶ 39    The State then called Shakira Fortune, J.M.'s case manager at Lutheran Child and Family Services since December 2023. She testified that TT had been placed with Ella as a foster mother when she was 12 and considered Ella to be her mother. J.M. was later placed with Ella and Ella's husband as a "[f]ictive kin placement." Ms. Fortune had seen J.M. in the past 30 days and found his placement safe and appropriate with no significant events. J.M. was five years old, about to start kindergarten, and had no behavioral or medical issues. Ms. Fortune had observed J.M. with Ella 10 to 12 times, and he seemed to be doing well, interacting with everyone in the home and calling Ella grandma.

¶ 40    Ms. Fortune had met with her supervisor the day before, and the agency was recommending that TT's parental rights be permanently terminated and a guardian be appointed with the right to place and consent to J.M.'s adoption. Ella would be the "adoptive resource" because J.M. was

bonded to Ella; "the placement that he's in is the only placement that he knows," Ms. Fortune explained. "All of his educational and medical needs are being met since he's been home. He's thriving and doing well in school."

¶ 41    On cross-examination by TT's attorney, Ms. Fortune said she had not observed J.M. interact with TT because Ella supervised those visits.

¶ 42    The court found it was in J.M.'s best interests to terminate TT's parental rights. The court said that TT had "basically forfeited to the foster parents. And maybe in part it's because we've said from the beginning that hey, you can visit and work it out with your mom, and they have, and they've relied on the mother to do all the—[Ella] to do all the heavy lifting here, and haven't made progress." The court noted that it seemed it would be a "good working relationship" between all parties, and that it was "definitely in everyone's best interest that I make those findings." The court appointed a guardian with the right to consent to adoption.

¶ 43    The court entered a termination hearing order consistent with its oral findings that same day, April 17, 2024. It found by clear and convincing evidence that TT was unfit subject to grounds (b) and (m) of section 2-29 of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)), and it was in J.M.'s best interests to terminate TT's parental rights.

¶ 44    This appeal followed.

¶ 45                                    II. JURISDICTION

¶ 46    The trial court terminated TT's parental rights on April 17, 2024, and TT timely filed her notice of appeal on April 18, 2024. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases, and Illinois Supreme Court Rule 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Juvenile Court Act.

13

¶ 47                              III. ANALYSIS

¶ 48    On appeal, TT argues that the trial court (1) deprived her of due process by failing to timely set permanency placement goals for J.M. and by failing to explain in writing the reasons why other goals were not chosen, (2) erred in finding the State proved by clear and convincing evidence that she was unfit under both ground (b) and ground (m) of the Adoption Act, (3) deprived her of a fair trial by conflating the fitness and best interests portions of the termination hearing, and (4) deprived her of a fair hearing as a result of its cumulative errors. We consider each issue in turn.

¶ 49              A. The Permanency Hearings and TT's Due Process Rights

¶ 50    TT first argues that the trial court deprived her of due process when it failed to comply with the requirements of section 2-28 of the Juvenile Court Act, which provides that the first permanency hearing shall be held "within 12 months from the date temporary custody was taken." 705 ILCS 405/2-28(2) (West 2022). Section 2-28 also provides several permanency goals—from return home within five months to adoption after the termination of parental rights—and the court is required to choose one. *Id.* "In selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were deemed inappropriate and not in the child's best interest." *Id.* The statue also provides that "[s]ubsequent permanency hearings shall be held every 6 months or more frequently if necessary in the court's determination following the initial permanency hearing, *** until the court determines that the plan and goal have been achieved." *Id.*

¶ 51    According to TT, the trial court violated her due process rights both by failing to timely set permanency goals and failing "to set forth in writing the reasons why preceding goals had not been selected" in violation of the requirements of section 2-28. TT reasons that she "was never informed

in writing *by the court* what was expected of her within a defined period and how she was progressing on those expectations, as reviewed by the court on a regular six-month basis, all of which deprived her of a fair opportunity to reunify with her child under the auspices of the court." (Emphasis in original.) She asks that we invalidate the permanency orders and all subsequent orders, including the termination order, and remand the case with instructions to the trial court to follow the procedures listed in the statute.

¶ 52    Because permanency orders are meant to be reviewed and modified every six months until the permanency goal is achieved, they are not final orders and are thus not themselves appealable as of right. *In re Curtis B.*, 203 Ill. 2d 53, 59-60 (2002); *In re D.S.*, 198 Ill. 2d 309, 329 (2001). A barrier to TT's claim in this case is the limitation that "once parental rights have been terminated, this court will not delve into and review the trial court's preliminary determinations in the respondents' case. At this point in the proceedings, the only order subject to review is the court's finding on the termination petition." *In re Jordan V.*, 347 Ill. App. 3d 1057, 1066 (2004).

¶ 53    As we explained in *Jordan V.*, consideration of permanency and other preliminary orders is proper only to the extent that (1) those orders adversely affected the respondent's ability to make reasonable progress, and (2) evidence of that impediment was considered by the trial court during the termination proceedings. *Id.* Where these conditions are not met, we concluded that such interlocutory orders were "irrelevant and not justiciable." *Id.* at 1067. Although TT asserts that the failures in the permanency hearing process here "deprived her of a fair opportunity to reunify with her child under the auspices of the court," she never explains *how* they did so or offers any evidence or arguments as to how her services or behavior would have changed with better adherence to the permanency hearing statute. And without that connection, her arguments about the permanency hearing process are simply irrelevant to the only issue before us—whether the trial court erred in

terminating her parental rights.

¶ 54　The permanency hearing process in this case was clearly flawed. Although the court held a permanency hearing within 12 months of when J.M. was taken into temporary custody, it did not select a permanency goal until almost *two years* after the date of temporary custody. Instead, the court "reserved" the selection of any goal in the first two permanency orders. Section 2-28 makes no mention of reserving the selection of a permanency goal, and it is unclear why the court did so here. 705 ILCS 405/2-28 (West 2022). In addition, several permanency hearings were not held within six months of the prior hearing, also in violation of the statute. TT, however, has not shown that her ability to progress toward a goal of return home before her parental rights were terminated was actually hampered in any way by the procedures followed in this case.

¶ 55　While the permanency orders may not have laid out a clear road map, as both the State and J.M.'s attorney point out, TT received guidance about what was expected of her from the integrated assessment and the service plans. The service plans themselves had a goal of return home until the February 2022 plan, and listed the services and tasks required of TT for reunification, as well as evaluations for her progress for each service or task. Although TT did not receive a permanency goal from the trial court until March 2021, it is clear from the record that she did have a road map to follow toward the goal of reunification. She has thus not shown a violation of her right to due process or any basis for reviewing the permanency hearing process at this point in the proceedings.

¶ 56　　　　　B. Sufficiency of the Evidence to Support the Findings of Unfitness

¶ 57　We next address TT's argument that the trial court's unfitness findings were insufficiently supported by the evidence. A termination of parental rights pursuant to the Juvenile Court Act involves a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined

16

in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998)).” *Id.* If a showing of unfitness has been made, “the court then considers whether it is in the best interests of the child that parental rights be terminated.” *Id.* “Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed ‘unfit,’ any *one* ground, properly proven, is sufficient to enter a finding of unfitness.” (Emphasis in original.) *Id.* In addition, “[a] finding of unfitness will not be reversed unless it is against the manifest weight of the evidence,” *i.e.*, “where the opposite conclusion is clearly apparent.” (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21.

¶ 58     Here, the trial court found TT unfit based on both ground (b) and ground (m), and she argues that the court erred in making both findings. We find that the trial court’s finding of unfitness on each of these grounds was sufficiently supported by the evidence.

¶ 59     Initially, TT argues that certain exhibits and testimonial evidence relied on by the State contained improper hearsay. These included unsigned service plans, the unsigned parenting capacity assessment report, and David Lyons’s testimony about the February 2020 incident. TT acknowledges that she did not object to the admission of any of this evidence, but asks that we review these purported errors under the second prong of the plain error doctrine, which allows for review of an unpreserved error when “a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant’s trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.” *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 60     With respect to the parenting capacity assessment and service plans, not only did TT not object to their admission but, as she acknowledges, she stipulated to their admission. When a party “actively invites or acquiesces to the admission of a piece of evidence at trial, [they] cannot

challenge the admission of that evidence as plain error on appeal." *People v. Quezada*, 2024 IL 128805, ¶ 59. As our supreme court explained, "[t]his is so because invited error or acquiescence does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." (Internal quotation marks omitted.) *Id.* Accordingly, we will not consider whether admission of these documents rose to the level of plain error.

¶ 61    Moreover, section 2-18(4)(a) of the Juvenile Court Act specifically contemplates that some of the agency business records admitted will include narratives of events about which the creator of the record may have no personal knowledge, providing that the lack of knowledge goes to the weight of the evidence but not its admissibility. 705 ILCS 405/2-18(4)(a) (West 2022).

¶ 62    TT did not affirmatively acquiesce to the admissibility of those portions of Mr. Lyons's testimony regarding the February 2020 incident, of which Mr. Lyons had no personal knowledge, and that testimony is not a business record. However, second-prong plain error is available only if the unchallenged error affected the fairness of the trial or the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565. TT's only argument in support of this requirement is that the rights involved are fundamental—citing *In re J.C.*, 2020 IL App (2d) 200063, ¶ 26—which is of course true, but that does not demonstrate that admission of this testimony, assuming it was inadmissible hearsay, affected the integrity of the hearing.

¶ 63    To the contrary, Mr. Lyons's hearsay testimony about the incident in February 2020 when TT was arrested for attacking J.M.'s father is also in the service plans, the admission of which TT stipulated to. Even if this testimony was inadmissible hearsay, and even if an objection had been made, it was simply cumulative of stipulated-to evidence.

¶ 64                                1. Ground (b)

¶ 65    Section 1(D)(b) of the Adoption Act provides that a parent is unfit if they fail "to maintain

18

a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2022). "A parent is not fit simply because she has shown some interest in or affection for the children." *In re Jaz. R.*, 2024 IL App (1st) 231947, ¶ 54. "Rather, the interest, concern, and responsibility must be objectively reasonable." *Id.* Unlike ground (m), discussed below, allegations of unfitness based on ground (b) do "not contemplate a specific time frame," so a trial court should "consider evidence of the parent's conduct during the entire period between the loss of custody and the date of the fitness hearing." *In re J.O.*, 2021 IL App (3d) 210248, ¶ 37.

¶ 66    Both the parenting capacity assessment and the integrated assessment show that TT was not capable of maintaining a reasonable degree of responsibility for J.M.'s welfare. In the parenting capacity assessment, the examiner concluded that TT could not meet minimum parenting standards. The examiner stated that "[TT]'s mental health concerns [we]re severe and chronic," she "continued to exhibit outbursts," "she manifested tangential thought processes and grandiosity," and she "view[ed] herself as the 'cool aunt' for her children." According to the examiner, TT was "unlikely to be able to develop adequate skills in a reasonable time frame, given the nature of her concerns as well as the fact that she ha[d] received services over the course of her lifetime." The examiner observed TT's "general lack of affection towards her sons" and that she "did not appear to be entirely empathetic" toward them, and said that TT did not "display the capacity to care for the safety and security of her children." In addition, although the examiner acknowledged TT was willing to follow through with recommendations, the examiner did not believe she had the capacity to do so, stating:

> "She has been accorded numerous services that would provide her with a solid basis for
> understanding appropriate and basic parenting, but she has not internalized these
> suggestions/educational experiences. Her mental illness and limited judgment prevent her

from being open to fully understanding and making use of the learning she has received."

¶ 67    In the integrated assessment, the reporter noted that TT "appeared to minimize her mental health symptoms" and that she had a "history of noncompliance with mental health services." The reporter also observed that TT denied that domestic violence had been present in her romantic relationships despite a clear history to the contrary, and that although TT understood she had to complete domestic violence classes, "she did not appear to understand the reason why she had to complete them." The reporter said, "If [TT] is unable to acknowledge the domestic violence that has occurred, she will likely also have difficulty understanding how the domestic violence impacts her children."

¶ 68    The integrated assessment reporter also noted that TT "may experience sadness, anger, rejection, or other emotions when interacting with others, and respond in a manner that is unsafe or aggressive towards others." TT demonstrated this sort of behavior on multiple occasions. According to the service plans, TT completed a domestic violence service but then was arrested for domestic violence in February 2020 when she attacked J.M.'s father, and in December 2020, she sprayed mace in Ella's home. Ella testified about that incident, explaining that she and TT had a disagreement about gifts and, in response, TT sprayed mace in the air with J.M. in the next room, prompting Ella to call the police. Ella and Ms. Williams also both testified about TT failing to bring J.M. home in a timely manner near the end of Ms. Williams's tenure. While TT's excuse that she had run out of money on her bus card may have been reasonable, it was not reasonable for her to refuse to tell Ella or Ms. Williams where she was. And Ella also described a time in September 2023 that TT called DCFS to report Ella because Ella and TT had a disagreement about one of Ella's other foster children. These incidents support the trial court's finding by demonstrating that TT failed to consistently exercise sound judgment, even after engaging in

services such as therapy and the domestic violence class.

¶ 69    The service plans also show TT's inconsistency and inability to maintain responsibility for J.M. In multiple service plans it was noted that TT made "minimal progress" and that "her behavior [wa]s irrational and at times still manipulative and violent." TT was told to get a second psychiatric evaluation because "her mental health capacity [wa]s questionable," as demonstrated by "many episodes of erratic and violent behavior," but she never did so. In addition to being "violent and aggressive," TT lacked empathy and continued to "exercise[e] poor judgment." This evidence shows that TT has struggled with her mental health issues, domestic violence, and parenting since before J.M. was taken into temporary custody and has been inconsistent with efforts to get those concerns under control.

¶ 70    TT points out that she has recently obtained housing, found employment, and been consistently taking her medications. This appears to be uncontested, although there is disagreement as to how long TT has been medication-compliant. TT argues in her brief that she has been consistent with her medication since 2021. However, Mr. Lyons, who was her caseworker from August to September 2021, testified that she had issues complying with her medication at that time, and Ella testified that TT had only been consistent with her medication for about a year at the time of the hearing in early 2024. A period of progress, while commendable, does not change the fact that TT failed to maintain a reasonable degree of responsibility. Both Ms. Williams and Ella testified that, even when things would get better, they would always get worse again.

¶ 71    The trial court appropriately relied on the evidence of violent outbursts, domestic violence, and poor parenting. The court also referenced TT's failure to attend the fitness portion of the termination hearing. This too supported the finding that TT failed to take a reasonable degree of responsibility for her son's welfare. If she believed that she was capable of parenting, as the court

mentioned, "it would have helped if she came in and testified to rebut the evidence."

¶ 72    We have no doubt that TT wanted to make progress and wanted J.M. returned to her. Our supreme court has made clear, however, that ground (b) "includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or *an inability* to comply." (Emphasis added.) *M.I.*, 2016 IL 120232, ¶ 26. TT was inconsistent with services and failed to demonstrate she could alter her behavior in a sustainable and meaningful way. The court's finding that TT failed to maintain a reasonable degree of responsibility for J.M.'s welfare was not against the manifest weight of the evidence.

¶ 73                                                 2. Ground (m)

¶ 74    Because any one ground for a finding of unfitness under section 1(D) of the Adoption Act is sufficient (*C.W.*, 199 Ill. 2d at 210) and here we have already found the evidence sufficiently supported the trial court's finding of unfitness based on ground (b), we would normally have no need to consider whether the evidence also supported a finding based on ground (m). However, as noted below, TT argues for reversal on a theory of cumulative error, and therefore we address the evidence with respect to ground (m) briefly. We conclude that the court's finding of unfitness based on ground (m) was likewise supported by the evidence.

¶ 75    Section 1(D)(m) of the Adoption Act provides that a finding of unfitness may be based on a failure by the parent to either "make reasonable efforts" or "reasonable progress" to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of the minor as neglected or abused. 750 ILCS 50/1(D)(m) (West 2022). "These two bases are distinct and require separate analyses." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 76    The State presented evidence of unfitness for three nine-month periods: October 4, 2019, through July 4, 2020; July 5, 2020, through April 5, 2021; and January 27, 2021, through October 27, 2021. TT asserts that the State did not prove by clear and convincing evidence either that she failed to (1) make reasonable efforts to correct the conditions that were the basis for removing J.M. or (2) make reasonable progress toward J.M.'s return home during any of these periods. We agree with J.M.'s counsel that the court's findings were based on TT's failure to make reasonable progress, rather than a lack of reasonable effort on her part, so we will focus on that basis.

¶ 77    Reasonable progress toward return home has been defined as "demonstrable movement toward the goal of reunification," "judged under the familiar reasonableness standard." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211 (2001). " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). "The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphasis in original.) *Id.*

¶ 78    Much of the evidence that supports the court's finding of unfitness based on ground (b) also supports its finding based on ground (m). The parenting capacity assessment showed that, between her mental illness and limited judgment, even if she participated in the referred services, TT was simply not capable of making progress. The integrated assessment reporter observed that TT tended to minimize her issues with respect to her parenting abilities and her mental health. The hearing testimony further demonstrated that TT struggled to make reasonable progress. Mr. Lyons

testified that during his month as the case manager, the agency did not recommend that TT have unsupervised visits with J.M. due to her mental health issues and because she was noncompliant with services. Ms. Williams had met with TT frequently during her more than two years as the family's case worker, but still expressed concern about TT because "there were numerous incidents regarding violent behavior with [TT]." Ms. Williams explained that even when the agency recommended TT be allowed unsupervised visits with J.M., return home was not imminent because TT "would make progress, and then would shortly regress." Ms. Williams said that even when TT was consistent with services at the beginning of 2021, "there was still a concern about her judgment and her behavior" because, according to Ms. Williams, "I can't honestly say that she was making significant progress in those services, because her behavior had not changed." Ella similarly expressed that TT would make progress and then would experience a setback.

¶ 79    The service plans throughout those nine-month periods reflect periods of progress and some goals achieved but also serious setbacks and failures to sustain the progress. In multiple service plans it was noted that TT made "minimal progress," with respect to stabilizing her mental health. It was also noted that TT continued to make poor decisions and did not learn from her domestic violence counseling or her years of therapy.

¶ 80    Specific examples of setbacks were also presented at the hearing: the service plans refer to TT being arrested in February 2020 for assaulting J.M.'s father; Ella testified about December 2020 when TT sprayed mace inside Ella's home; and both Ella and Ms. Williams testified about a time at the end of Ms. Williams's tenure when TT was unable to bring J.M. back to Ella but refused to tell Ella or Ms. Williams where she and J.M. were.

¶ 81    At the end of the three nine-month periods—on October 27, 2021—the trial court changed the goal to private guardianship because TT had "failed to make substantial progress towards

24

return home" of J.M. The evidence presented showed neither demonstrable movement toward reunification or that TT would regain custody of J.M. in the near future. Given all of the above, the trial court's finding of unfitness based on ground (m) was not against the manifest weight of the evidence for any of the three nine-month time periods; the opposite conclusion is not clearly apparently in the face of the evidence.

¶ 82    D. The Trial Court's Alleged Conflation of the Fitness and Best interests Portions

¶ 83    TT next argues that the trial court deprived her of a fair hearing by conflating the fitness and best interests portions of the termination hearing when it (1) elicited testimony from J.M.'s foster mother that was central to the issue of J.M.'s best interests during the fitness portion of the hearing and (2) specifically said that  TT's rights should be terminated at the end of the fitness portion, "thereby prejudging the ultimate issue before hearing all evidence on the issue of best interest."

¶ 84    Initially, the State and counsel for J.M. both argue that TT has forfeited consideration of these issues by failing to object to the challenged testimony and ruling. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41. TT argues that the forfeiture should be overlooked because she is essentially arguing that the trial court abandoned its role as neutral arbiter and improperly advocated for the State, which does not require an objection. *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000); see also *People v. Jackson*, 409 Ill. App. 3d 631, 646 (2011) (where the trial court allegedly abandoned its role as neutral arbiter, the issue was reviewable under the second prong of the plain error doctrine). While we cannot ignore the fact that no objection was made, we need not resolve the parties' dispute over forfeiture, since we find that even if the errors were preserved, neither of these actions by the trial court deprived TT of a fair hearing.

¶ 85    TT first argues that she was deprived of a fair trial when, during the fitness portion of the

hearing, the court questioned J.M.'s foster mother, Ella, about issues relating to J.M.'s best interests—whether she was willing to adopt him, whether she loved him and considered him to be part of her family, and whether she considered TT to be part of her family. We find this questioning of Ella on matters concerning J.M.'s best interests during the fitness portion, while it raises the risk that the court could improperly conflate fitness and best interests, did not deprive TT of a fair trial in this case.

¶ 86    Our supreme court has made clear that "[w]hen ruling on parental unfitness, a court is not to consider the child's best interests." (Internal quotation marks omitted.) *M.I.*, 2016 IL 120232, ¶ 20. Here, however, despite its questioning of Ella on matters concerning J.M.'s best interests during the fitness hearing, it is clear the trial court did not *consider* J.M.'s best interests when making its unfitness findings.

¶ 87    At the end of the fitness portion of the hearing, the State clarified that the court was *not* relying on Ella's best-interests testimony for its unfitness findings. The court explained that its questioning of her on those matters "was taken out of turn, so she c[ould] go home" and that it was relying on the evidence that supported the unfitness grounds alleged in the termination petition.

¶ 88    A better procedure clearly would have been to get the parties' agreement before questioning Ella on best interests issues during the fitness portion of the termination hearing. The court also should have invited the parties to examine Ella on best interests if it was going to question her on that issue. But the failure of the court to do those things, where, as here, no party objected to taking the testimony at that time or asked to cross-examine on best interests, did not deprive TT of a fair trial.

¶ 89    TT argues that the trial court "implicitly relied on the best interest testimony it had elicited when it found that the foster mother [wa]s 'doing the heavy lifting' as 'surrogate' mom" in its

unfitness findings, relying on cases in which a trial court used the term "heavy lifting" in its best interests determination. *In re S.R.*, 2024 IL App (4th) 231238-U, ¶ 28; *In re Abr. B.-F.*, 2022 IL App (4th) 220181-U, ¶ 37. The fact that other trial court judges have used this same term in their best interests findings certainly does not render that term best-interest exclusive. And, as TT acknowledges, this same trial judge has used the term "heavy lifting" in an unfitness finding previously. *In re Je.R.*, 2024 IL App (1st) 232140-U, ¶ 20.

¶ 90    In this case, the court's noting that Ella was doing the heavy lifting supported its findings that that TT failed to maintain a reasonable degree of responsibility for J.M.'s welfare and failed to make progress toward return of J.M. As the court explained, the evidence showed that TT was making no progress or "very little progress" because she was relying on Ella "to basically do the heavy lifting." TT knew she could "come by at any time and be the parent, because the foster parent, in this case surrogate mom, permit[ted] it. And as a result, they just rely on them." The court pointed to this fact several times in support of its unfitness findings.

¶ 91    TT also argues she was deprived of a fair trial when, at the beginning of its unfitness ruling the trial court said it found that her rights should be terminated—a finding that should be made only following the best interests portion of a termination hearing—and therefore, according to TT, "prejudging the ultimate issue before hearing all evidence on the issue of best interest."

¶ 92    TT is correct that in its oral ruling on unfitness the court improperly said that it found "by clear and convincing evidence that the rights should be terminated." This was not right because, at that point, the only finding that should have been made was whether the State had proven that TT was unfit. In context, however, it is clear that the court simply misspoke and understood that it was making an unfitness finding. The court repeatedly referenced TT's reliance on Ella to raise J.M. and her failure to make progress. If any doubt remained as to whether the court misspoke,

after the court's ruling, the State asked for clarification, and the court said TT was being found unfit on "[a]ll grounds named" and agreed those were ground (m) and ground (b). The court then went on to conduct the best interests portion of the hearing, where the State called an additional witness, and in its best interests findings, the court specifically refenced that there was a "good working relationship" between the parties and it was "in everyone's best interest" that parental rights be terminated.

¶ 93    Where the evidence overwhelmingly shows that the trial court simply misspoke in its unfitness ruling when it said that TT's rights should be terminated, there is no basis for finding that she was deprived of a fair trial. It is not uncommon for a trial court judge to misspeak and, on review, we look at whether what the court actually did complied with the law. See, *e.g.*, *In re E.R.*, 2015 IL App (2d) 150432-U, ¶ 54 (where the trial court indicated the parties were before it for the best interests portion of the termination hearing before it had ruled on fitness, we noted that even if the court had misspoke, "the record makes clear that this was nothing more than one, inadvertent slip of the tongue," because the court conducted two separate hearings, applied the correct standards, and considered the appropriate evidence for each").

¶ 94    TT relies on *In re D.L.*, 2022 IL App (1st) 220222, ¶ 46. In that case, this court found the trial court improperly conflated the fitness and best interests evidence by relying on the minors' distress with their mother in the fitness portion of the trial. Here, in contrast, there was no substantive conflation of the minors' best interests and the mother's fitness. Rather, the court took best interests testimony before the unfitness finding was made and improperly referenced termination, when it clearly should have said unfitness.

¶ 95    TT's reliance on *In re D.M.*, 2024 IL App (1st) 230508, ¶ 37, is similarly unpersuasive, as that case had to do with the conflation of the adjudicatory and dispositional hearings, not the fitness

and best interests portions of a termination hearing.

¶ 96     TT also relies on *In re G.W.*, 357 Ill. App. 3d 1058 (2005), where the appellate court vacated a trial court's termination of parental rights, which TT argues was "based on the trial court's direction in its oral unfitness ruling that a parent's rights be terminated." But in that case this court was concerned that there was an actual failure by the trial court to differentiate between fitness and best interests. The trial court in *G.W.* failed to provide any findings of fact in support of its unfitness finding. *Id.* at 1060. In addition, the trial court "*repeatedly* invoked the best interests of the children at the conclusion of the fitness hearing" (Emphasis added.) *Id.* at 1061. We acknowledged that the misstatements "may have been nothing more than inadvertent slips of the tongue," but said that "in the absence of any factual findings by the trial court, we c[ould not] determine whether the trial court merely misspoke or was truly confused and misapplied the standards and findings of the best interests hearing to the fitness hearing." *Id.* at 1061-62. None of that is true here, where the court made factual findings in support of unfitness and then proceeded to a separate best interests portion of the hearing.

¶ 97                                E. Cumulative Error

¶ 98     Finally, TT contends that even if no single error by the trial court was sufficient to reverse, together the cumulative effect of the court's errors requires reversal. Having found no error, however, we find no cumulative error.

¶ 99                                IV. CONCLUSION

¶ 100   For the foregoing reasons, we affirm the judgment of the trial court terminating TT's parental rights with respect to J.M.

¶ 101   Affirmed.